**2021 IL 124818**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124818)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
KEVIN JACKSON, Appellant.

*Opinion filed February 19, 2021.*

CHIEF JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Garman, Theis, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

Justice Neville specially concurred, with opinion.

**OPINION**

¶ 1    Petitioner, Kevin Jackson, was convicted in the circuit court of Cook County of first degree murder and aggravated battery with a firearm. After his direct appeal and an initial postconviction petition were both unsuccessful, he sought leave in the

circuit court to file a successive postconviction petition. The successive postconviction petition, which is at issue in this appeal, raises two claims: first, that petitioner's constitutional right to due process of law was violated at trial by the State's use of witness statements that were the product of police intimidation or coercion and, second, that petitioner is actually innocent of the crimes for which he was convicted. In support of these claims, petitioner has attached documents to the successive postconviction petition that purport to show a pattern and practice of witness intimidation in other cases by the police detectives who obtained the witness statements, as well as exculpatory affidavits.

¶ 2     The circuit court denied petitioner leave to file the successive postconviction petition, and the appellate court affirmed. 2018 IL App (1st) 171773. For the reasons that follow, we affirm the judgment of the appellate court.

¶ 3                              BACKGROUND

¶ 4     Petitioner was tried before a jury on charges of first degree murder and aggravated battery with a firearm in connection with a shooting that occurred at a gas station on the corner of Damen Avenue and 55th Street in Chicago. At trial, the State presented evidence that, around 1:30 a.m. on May 6, 2001, 54-year-old Ernest Jenkins drove his car to the gas station to purchase gas. Stanley "Meechie" Watson (Meechie), who was a member of the Gangster Disciples gang, and Meechie's uncle, Michael Watson (Watson), were passengers in Jenkins's car. The gas station was located in the territory of the Vice Lords gang, a rival to the Gangster Disciples.

¶ 5     At the station, Jenkins stayed inside the car while Watson got out to pump the gas and Meechie got out to pay for it. As Meechie was walking back to the car after paying, he saw a member of the Vice Lords approaching with a gun. He tried to warn Watson, but before they could flee, the Vice Lord began shooting. Jenkins was struck by the gunfire and died of his injuries. Watson was struck once in the leg and survived. Meechie escaped injury entirely.

¶ 6     Watson later told police that the shooter was a "dark black" "little, thin guy." He also provided police with a description of the shooter's car. Approximately two weeks later, police found petitioner driving a car matching that description two blocks from the gas station. The car, it was learned, was co-owned by petitioner

and his cousin Manuel Stewart. Following further investigation, petitioner was arrested for the shooting. At the time of his arrest, petitioner, an African American man, was 5'9" tall and weighed 150 pounds.

¶ 7    At trial, Watson testified that, before driving to the gas station with Jenkins, he had warned Meechie not to come along because the station was in Vice Lord territory and Meechie was a Gangster Disciple. Watson also testified that, while the shooter was a small, thin, African American man, he had never seen petitioner before and that petitioner "don't look nothing like the guy" who shot him because his complexion was too light. However, Watson also testified that he did not know who shot him and that he did not see the person who shot Jenkins.

¶ 8    In addition to Watson, the State presented the testimony of four other eyewitnesses, Stewart, Brandy Butler, Vernon Clay, and Shemika Mason. Before trial, each of these four witnesses signed a written statement in the presence of an assistant state's attorney, identifying petitioner as the shooter. In each of these statements, the witness indicated that he or she was treated well by the police and that the statement was not the result of intimidation or coercion. In addition, three of the witnesses—Butler, Clay, and Stewart—testified before a grand jury, where they confirmed the accuracy and truthfulness of their signed statements. At trial, however, all four witnesses recanted their prior written statements, claiming they were the product of police intimidation. Butler, Clay, and Stewart also recanted their grand jury testimony. Each of the four witnesses was impeached by the prosecution with his or her written statement, and each written statement was read to the jury. The grand jury testimony was also read to the jury.

¶ 9    The first eyewitness called was Butler. She testified that she met with police on June 21, 2001, at which time she gave a signed, pretrial statement to Assistant State's Attorney (ASA) Colleen Daly in the presence of two detectives. She also testified before the grand jury. In both her statement and her grand jury testimony, Butler stated that on May 6, 2001, Stewart drove her, petitioner, and two other companions, Quiana Davis and Mario Brown, to the gas station. Butler further stated that, as she exited the vehicle, she saw Meechie, who called out to her and Davis. Butler said she ignored Meechie and continued walking to the gas station to purchase a "blunt." While inside the gas station, she heard four or five gunshots, looked out the window, and saw petitioner, a member of the Vice Lords, firing a

- 3 -

gun in the direction of Meechie, whom she knew to be a member of the Gangster Disciples. Butler said she then got down on the floor and did not see anything after that.

¶ 10        At trial, Butler recanted her pretrial statement and grand jury testimony, stating she was forced to lie by the police and that petitioner was not the shooter. Butler acknowledged being at the gas station at the time of the shooting but testified petitioner was "nowhere around." She further testified that she was pregnant at the time she gave her statement to the police and that she was afraid of them. She stated the police tried to trick her by showing her an unsigned statement in which, according to the police, petitioner had admitted he was the shooter. Butler claimed the police made up the entire story and told her she would "do time" for the shooting if she did not sign a statement implicating petitioner. She also stated the police threatened her, saying she was "gonna be staying here for days and days. You're gonna have your baby in here." However, Butler also acknowledged that, when she was alone with ASA Daly, she told her that she had been treated "fine" by the interviewing detectives.

¶ 11        The next eyewitness called at trial was Vernon Clay. In his pretrial statement, Clay stated he and petitioner were members of the Vice Lords and that petitioner and Davis had a sexual relationship. Clay further stated that, on May 6, 2001, he walked to the gas station, which was near his home, accompanied by a woman named Shemika Mason. When they arrived at the gas station, he saw Davis get out of petitioner's car and start talking to Meechie, a Gangster Disciple. Clay said that Meechie and Davis used to date and that Meechie loudly propositioned her. Clay stated that he, Meechie, Davis, and Mason then all went inside the gas station, to buy "blunts." Petitioner and Stewart remained in their car. Then, as Meechie and Davis exited the gas station, still talking together, he heard gunshots and saw petitioner fire about eight shots at Meechie and into a car that Meechie had been in when he got to the station. Clay saw Meechie run in one direction, and petitioner ran in a different direction.

¶ 12        Clay's grand jury testimony was similar, except that he stated Davis was not in petitioner's car but had walked to the gas station with him, Butler, and Mason. Clay still maintained in his grand jury testimony that "Googie shot at Meechie."

¶ 13     At trial, Clay recanted his written statement and grand jury testimony, stating that he was not at the gas station on May 6, 2001. Instead, he claimed that he was at home sleeping and knew nothing about the shooting. Clay admitted signing each page of his 5-page written statement but said something was held over the pages as he signed, so he did not know what was written on the pages. He further stated that the police told him he was merely signing a property receipt. According to Clay's trial testimony, he did not realize what was actually on the papers he had signed until June 28, 2001, when the detectives drove him to the courthouse to testify before the grand jury. During the ride to the courthouse, Clay said, the detectives told him what he needed to say and threatened him with imprisonment and said it would "cost [him]" if he did not testify correctly. Clay stated,

> "When they brung me here and they told me what I had to do unless I was gonna go to jail, they brung me here, they ain't never tell me I had to go do nothing or none of that. *** They told me how many times I was convicted, how many cases I was fighting, and then they told me what I had signed. *** They told me to say 'yes' to every question and if I go up in there and I tell them what really happened, I tell them I wasn't never there, I would never see the streets again."

Clay also denied making any incriminating statements regarding petitioner before the grand jury, although the transcript from the grand jury containing those statements was read back to him at trial.

¶ 14     The third witness was Shemika Mason. In her pretrial statement she stated that petitioner was the shooter and that, following the shooting, he had told her, Butler, and Davis not to talk to the police. However, at trial she testified that she was not at the gas station when the shooting occurred. Instead, she was at Davis's house. She said she had been tired after partying all night with her friends, including Butler and Davis, so she did not go with them when they went to the gas station. She further stated that she only went to the gas station later, when Davis called her, crying, and saying that somebody had just got shot at the gas station.

¶ 15     At trial, when asked about her pretrial statement, Mason stated:

> "Well, basically I tried telling them that I was not there. They kept arguing with me, calling me B's, telling me I was there because I was with a girl name Quiana and Brandy. And then I had a warrant at the time, I was running from the police,

and I had had a warrant and they told me if I go along with what they want me to say or whatever, they was gonna take care of my warrant."

¶ 16    Stewart similarly recanted his pretrial statement identifying petitioner as the shooter. Stewart testified at trial that he tried to tell the police that someone else was the shooter but that he signed the statement implicating petitioner because the police threatened to charge him with the murder.

¶ 17    The State rebutted the trial testimony of these four witnesses with testimony from police detectives Brian Forberg, Kevin Howley, and John Clisham, all of whom stated that the witnesses who had signed statements identifying petitioner as the shooter had been treated well and freely agreed to give their statements. In addition, ASA Daly testified that she took the statements of Butler and Mason and that both of these witnesses told her that they had been treated well by the police detectives and had not been threatened or promised anything. ASA Kathleen Lanahan testified that the grand jury testimony of Stewart, Butler, and Clay was freely offered. Based on this testimony, the four pretrial statements and the grand jury testimony of the three witnesses were read into the record as substantive evidence pursuant to section 115-0.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-0.1 (West 2000)), which permits admission of prior inconsistent statements made from personal knowledge and written or signed by the witnesses.

¶ 18    In closing arguments, the State asserted that the shooting of Jenkins and Watson was the result of a dispute over a woman between rival gang members. According to the State, petitioner, who was a Vice Lord, shot at Meechie, a Gangster Disciple, because the gas station was in Vice Lord territory and because Meechie had propositioned Davis, petitioner's girlfriend. Meechie was thus the intended target of the shooting, while Watson and Jenkins were caught in the crossfire.

¶ 19    Defense counsel, in response, argued that the evidence did not support the State's theory of the case. According to counsel, petitioner had been "framed" by the police by "sweat[ing]" the witnesses to make them implicate petitioner. Therefore, counsel argued, the pretrial statements and grand jury testimony were unreliable and should be disregarded.

¶ 20    After deliberation, the jury found petitioner guilty of first degree murder and aggravated battery with a firearm. Petitioner was later sentenced to imprisonment

for 45 years and 6 years, respectively. Petitioner's convictions and sentences were affirmed on direct appeal. *People v. Jackson*, No. 1-04-1784 (2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 21　　　In 2007, petitioner filed *pro se* a petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), alleging, *inter alia*, that his trial counsel was ineffective for failing to call Quiana Davis as a witness. The circuit court refused to consider an affidavit from Davis because it was not signed, and the court summarily dismissed the petition as frivolous and without merit on March 16, 2007. That dismissal was affirmed on appeal. *People v. Jackson*, No. 1-07-1680 (2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 22　　　On June 2, 2017, petitioner, represented by counsel, filed a motion seeking leave to file a successive postconviction petition, which is the subject of the appeal currently before this court. Petitioner raises two claims in the successive postconviction petition. First, he alleges that the State violated his right to due process of law at trial by relying on coerced witness statements to obtain his convictions. In support, petitioner has attached documents purporting to show a pattern and practice of witness intimidation and coercion by the detectives who took the statements; those documents include citizen complaint logs or registers as well as documents from civil lawsuits. Second, petitioner alleges he is actually innocent. This claim is supported by three new affidavits from Stewart, Butler, and Davis, averring that the shooter was not petitioner. The circuit court denied petitioner's motion for leave to file the successive postconviction petition, and the appellate court affirmed. 2018 IL App (1st) 171773.

¶ 23　　　In so holding, the appellate court concluded that petitioner was not prejudiced by the absence of the new evidence of police misconduct. *Id.* ¶ 92. According to the appellate court, this is because the new evidence alleged against several detectives was unlike the type of misconduct asserted by petitioner in this case. *Id.* ¶ 90. With respect to the attached affidavits, the appellate court concluded that Butler and Stewart's affidavits merely repeated their trial testimony and that Davis's affidavit was not "new," within the meaning of a claim of actual innocence, because she was known to the defense at the time of trial. *Id.* ¶¶ 73, 76.

¶ 24　　Presiding Justice Mikva dissented upon denial of rehearing, finding that petitioner had sufficiently alleged a connection between the conduct of two of the detectives in this case and their alleged misconduct in two unrelated, civil cases documented in the successive postconviction petition. *Id.* ¶ 98 (Mikva, P.J., dissenting). Presiding Justice Mikva also concluded that, in the interest of fundamental fairness, Davis's affidavit should be considered "new" evidence for purposes of petitioner's claims of actual innocence. *Id.* ¶ 121.

¶ 25　　We granted petitioner's petition for leave to appeal pursuant to Illinois Supreme Court Rule 315 (eff. July 1, 2018).

¶ 26　　　　　　　　　　　　　　　ANALYSIS

¶ 27　　At issue here is the circuit court's denial of petitioner's motion for leave to file a successive postconviction petition under the Act (725 ILCS 5/122-1 *et seq.* (West 2014)). The Act provides a statutory mechanism for a criminal defendant to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." *Id.* § 122-1(a)(1). The Act contemplates the filing of only a single petition. *People v. Robinson*, 2020 IL 123849, ¶ 42; 725 ILCS 5/122-3 (West 2014) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived."). However, the bar against a successive filing will be relaxed in two situations. First, a defendant may raise a constitutional claim by satisfying the cause-and-prejudice test. *Robinson*, 2020 IL 123849, ¶ 42; see also 725 ILCS 5/122-1(f) (West 2014). Second, even without showing cause and prejudice, a defendant may assert a claim of actual innocence pursuant to *People v. Washington*, 171 Ill. 2d 475 (1996). *Robinson*, 2020 IL 123849, ¶ 42 (citing *People v. Edwards*, 2012 IL 111711, ¶ 23). The two types of claims are distinct. *People v. Reed*, 2020 IL 124940, ¶ 29 (an actual innocence claim "does not depend on—and is separate from—a challenge to the sufficiency of the evidence or an allegation of error in the court below"); *People v. Coleman*, 2013 IL 113307, ¶ 91 ("Where a defendant makes a claim of trial error, as well as a claim of actual innocence, in a successive postconviction petition, the former claim must meet the cause-and-prejudice standard, and the latter claim must meet the *Washington* standard."). Prior to filing a successive postconviction petition, a

petitioner must obtain leave of the circuit court. *Robinson*, 2020 IL 123849, ¶ 43. Our review of the circuit court's denial of a motion seeking leave to file is *de novo*. *Id.* ¶ 39.

¶ 28                    Whether Coerced Witness Statements Were Used at Trial

¶ 29        Petitioner contends his constitutional right to due process of law was violated at trial when he was convicted based on witness statements that were the product of police intimidation or coercion. The jury heard extensive argument at trial regarding this issue and necessarily rejected the contention that the witness statements were coerced and therefore unreliable. However, petitioner asserts that the material regarding police misconduct attached to his successive postconviction petition is new evidence that shows a pattern and practice of police intimidation and coercion of witnesses by the interviewing detectives in this case. According to petitioner, this evidence corroborates the witnesses' testimony in this case that they were subject to police intimidation by showing that the interviewing detectives were acting in conformity with their past pattern and practice. Petitioner maintains this evidence calls "into question the propriety of allowing the witnesses' prior inconsistent statements to be introduced at trial in the first instance."

¶ 30        Because petitioner is raising this claim of constitutional trial error in a successive postconviction petition, he must establish cause and prejudice. To establish "cause," petitioner must show some objective factor external to the defense that impeded his ability to raise the claim in his initial postconviction proceeding. *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002). To establish "prejudice," the defendant must show the claimed constitutional error so infected his trial that the resulting conviction violated due process. *Id.* at 464. In this case, the parties focus primarily on whether petitioner has demonstrated sufficient prejudice to warrant further proceedings.

¶ 31        Where, as here, the claim of prejudice rests on new evidence, the petitioner must show that his supporting evidence is of "such conclusive character that it will probably change the result upon retrial." *People v. Patterson*, 192 Ill. 2d 93, 139 (2000) (citing *People v. Hobley*, 182 Ill. 2d 404, 449 (1998)). In addition, the evidence must be material rather than merely cumulative, and " ' "it must have been discovered since the trial and be of such character that it could not have been

discovered prior to trial by the exercise of due diligence." ' " *Id.* (quoting *People v. Molstad*, 101 Ill. 2d 128, 134 (1984), quoting *People v. Baker*, 16 Ill. 2d 364, 374 (1959)).

¶ 32    In *Patterson*, this court found that new evidence of police misconduct, specifically, a pattern and practice of torturing criminal defendants into confessing, satisfied the conclusive character standard and was relevant to the defendant's claim that his confession was the result of torture by the police. In so holding, this court emphasized that the defendant in that case had consistently claimed he was tortured, that the defendant's allegations were consistent with documented findings of torture against the same officers who were involved in obtaining the defendant's confession, that the other instances of torture occurred at or near the time of the defendant's allegations, and that the other instances of torture involved similar methods of abuse. *Id.* at 145.

¶ 33    In this case, the appellate court rejected petitioner's contention that the documents attached to his petition established a pattern and practice of witness intimidation by any of the interviewing detectives. In so doing, the appellate court cited language in *Patterson* that noted the allegations of police brutality in that case were "strikingly similar" to instances of police brutality in other cases. *Id.* Petitioner contends the appellate court erred in relying on this language because it was merely descriptive of the allegations in that case and not a legal test for admissibility. We agree.

¶ 34    To be sure, similarity is a critical factor to consider when determining whether new evidence of police misconduct in other cases establishes a pattern and practice of certain behavior. However, the test is not one of exact or perfect identity. Rather, the critical inquiry is simply whether there is sufficient similarity between the misconduct at issue in the present case and the misconduct shown in other cases, such that it may fairly be said the officers were acting in conformity with a pattern and practice of behavior. This determination will necessarily depend on the unique facts of each case. See *id.* at 144-45 ("The question of relevancy is a determination to be made by the trial court after a consideration of, *inter alia*, the defendant's allegations of torture and their similarity to the prior allegations.").

¶ 35    Although we agree with petitioner's assertion that the appellate court incorrectly relied on the "strikingly similar" standard, we nevertheless conclude

that the appellate court correctly determined that petitioner's supporting documents relating to police misconduct do not warrant further proceedings on his claim of witness intimidation. Part of the documentation attached to petitioner's successive postconviction petition is a spreadsheet that lists citizen complaint logs or registers against the four detectives in this case who interviewed the eyewitnesses, Detectives Forberg, Foster, Clisham, and Howley. None of these complaints are for coercion or intimidation of a witness or suspect. The complaints thus have no relevance to determining whether any of the detectives were engaged in a pattern and practice of witness intimidation.

¶ 36    Petitioner has also attached documents relating to civil lawsuits addressing police misconduct. Of these, only two identify detectives who interviewed the testifying witnesses in this case. The first is Patterson v. City of Chicago, No. 11 CV 07052, ECF No. 1 (N.D. Ill. 2011). The complaint in that case alleged, in part, that witnesses were denied food and water and were manipulated into giving false statements. The case was settled with no finding of wrongdoing. Although Detectives Forberg and Foster were named as parties in this lawsuit, there are no allegations in the complaint specific to either of them, leaving uncertainty as to their exact role in the alleged incidents. Because there is no way to determine from this document if either Forberg or Foster engaged in any witness intimidation or coercion, this complaint has no probative value in establishing a pattern and practice of misconduct relevant to this case.

¶ 37    The second lawsuit cited by petitioner is a federal district court opinion granting summary judgment in favor of the defendant police officers in that case, *Bridewell v. City of Chicago*, No. 08 C 4947, 2012 WL 2458548, at *1 (N.D. Ill. June 27, 2012). According to petitioner, in this lawsuit Detective Forberg stipulated to obtaining false statements from witnesses through "coercion by withholding food, water, and bathroom breaks" in a manner "eerily similar" to those that witnesses testified he employed in this case. However, this is not an accurate description of the *Bridewell* case. The federal district court did note, as part of the stipulated facts, that one of the witnesses "was questioned in a windowless room for many hours without a bathroom break and at one point urinated in the interrogation room." *Id.* However, according to the district court, the treatment of this witness was disputed. As the court noted, the police said, "they told [the witness] she could take bathroom breaks." *Id.* The *Bridewell* case is thus a civil lawsuit with allegations of police

misconduct but no findings of wrongdoing. Moreover, the witness interview in *Bridewell* took place in 2006, five years after the interviews in this case. The lawsuit is thus not relevant to establishing a pattern and practice of witness intimidation. See *Patterson*, 192 Ill. 2d at 140 ("a single incident years removed has little relevance. However, a series of incidents spanning several years can be relevant to establishing a claim of a pattern and practice of torture.").

¶ 38    In his successive postconviction petition, petitioner also suggests that the *Bridewell* case could be used to impeach the credibility of Detective Forberg. However, mere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case does not raise an inference of bias or motive to testify falsely and "is not admissible to impeach the officer." *People v. Coleman*, 206 Ill. 2d 261, 279 (2002); *People v. Nelson*, 235 Ill. 2d 386, 422 (2009).

¶ 39    The material regarding police misconduct attached to petitioner's successive petition is not relevant to establishing a pattern and practice of witness intimidation by the interviewing detectives in this case. As such, defendant has not satisfied the "prejudice" prong of the cause-and-prejudice test, and leave to file was properly denied with respect to this claim.

¶ 40                                Actual Innocence

¶ 41    Petitioner also raises a claim of actual innocence in his successive postconviction petition and, in support, attaches three new affidavits from Stewart, Butler, and Davis, all of which state that petitioner did not shoot Jenkins and Watson. To establish a claim of actual innocence, the supporting evidence must be newly discovered, material and not cumulative, and of such conclusive character that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47 (citing *Edwards*, 2012 IL 111711, ¶ 32). A motion for leave to file a successive petition raising a claim of actual innocence should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence. *Id.* ¶ 44 (citing *People v. Sanders*, 2016 IL 118123, ¶ 24). In this case, it is clear that petitioner cannot set forth a colorable claim of actual innocence because his supporting affidavits are not new.

¶ 42    Within the context of an actual innocence claim, "newly discovered evidence" means evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Id.* ¶ 47 (citing *Coleman*, 2013 IL 113307, ¶ 96). Here, as the appellate court noted, both Stewart and Butler's affidavits are merely repetitive of their trial testimony and, thus, cannot constitute new evidence. 2018 IL App (1st) 171773, ¶ 73. Further, police reports appended to petitioner's successive postconviction petition make clear that Davis was known to the parties from early on in the police investigation. Indeed, in petitioner's initial postconviction petition he attested that Davis "was at trial" and "ready to testify" on his behalf. Moreover, in his affidavit attached to the initial postconviction petition, petitioner attested that Davis "was present during trial" and ready to testify. Thus, while Davis did not testify at trial, her proffered testimony also is not new.

¶ 43    Although Davis's affidavit is not new, petitioner nevertheless observes that no court has considered Davis's affidavit and that "fundamental fairness" requires further postconviction proceedings based on Davis's proffered testimony. We disagree.

¶ 44    Four eyewitnesses identified petitioner as the person who shot Jenkins and Watson in statements made to police detectives and assistant state's attorneys. Three of these witnesses repeated this identification before a grand jury. Although petitioner contends these statements were the product of police intimidation and coercion, that argument was rejected by the jury, and petitioner has not offered any evidence in this proceeding that would give us cause to disturb the jury's conclusion.

¶ 45    Further, while Davis's proffered testimony is exculpatory, it also cuts against petitioner in certain respects. For example, Davis never gave a statement to the police implicating petitioner. Her apparent ability to withstand the police harassment alleged by petitioner tends to undermine his primary contention that the four eyewitnesses succumbed to police coercion and intimidation. In addition, police records appended to petitioner's successive postconviction petition show that, had Davis testified, the State could have called multiple witnesses to testify that she told police petitioner was the shooter but that she refused to sign a statement because they were in a relationship and she did not want to hurt his case. Also,

Davis's affidavit repeats the information brought out at trial that the gas station was in "Vice Lord territory" and that Meechie "might be targeted by Vice Lords" for being there, thus adding support to the State's theory that the shooting was motivated in part by gang rivalry. Given these circumstances, we cannot say that principles of fundamental fairness require further postconviction proceedings based on Davis's affidavit and petitioner's claim of actual innocence.

¶ 46                                    CONCLUSION

¶ 47       For the foregoing reasons, the judgment of the appellate court, which affirmed the judgment of the circuit court, is affirmed.

¶ 48       Affirmed.

¶ 49       JUSTICE NEVILLE, specially concurring:

¶ 50       I agree with my colleagues that, under the specific circumstances of this case, petitioner has not satisfied the statutory requirements to warrant further proceedings on his proposed successive postconviction petition. I write separately because I am deeply troubled by the recurrence of complaints of serious misconduct by police officers against witnesses and defendants in criminal cases. Such allegations call for corrective action to ensure that the methods employed by police in the investigation and prosecution of criminal offenses are both fair and appropriate.

¶ 51       In this case, no fewer than four witnesses have attested that their statements identifying petitioner as the offender, which were given after being interrogated at the police station, were the product of police intimidation or coercion. Also, three of those witnesses attested that they were similarly coerced to falsely identify petitioner while testifying before the grand jury. Like my colleagues, I am compelled to conclude that this evidence does not justify advancing the proposed successive petition because it is not newly discovered and because the evidence of other unrelated complaints against the police detectives is not relevant to establish a pattern and practice of witness intimidation.

¶ 52     That said, I do not believe that prosecutors can sit idly by and allow serious complaints of witness intimidation and coercion to go uninvestigated. As this court has observed, a prosecutor is the representative of all the people, including the defendant in a criminal action, and is bound to safeguard the constitutional rights of the defendant as well as those of any other citizen. *People v. Lampkin*, 98 Ill. 2d 418, 430 (1983); *People v. Oden*, 20 Ill. 2d 470, 483 (1960).

¶ 53     The standards adopted by the American Bar Association (ABA) reflect:

> "The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict. The prosecutor serves the public interest and should act with integrity and balanced judgment to increase public safety both by pursuing appropriate criminal charges of appropriate severity, and by exercising discretion to not pursue criminal charges in appropriate circumstances. The prosecutor should seek to protect the innocent and convict the guilty, consider the interests of victims and witnesses, and respect the constitutional and legal rights of all persons, including suspects and defendants." ABA Standards for Criminal Justice, The Prosecution Function, Standard 3-1.2(b) (4th ed. 2017).

Moreover, section 3-8.3 of the ABA standards provides:

> "If a prosecutor learns of credible and material information creating a reasonable likelihood that a defendant was wrongfully convicted or sentenced or is actually innocent, the prosecutor should comply with ABA Model Rules of Professional Conduct 3.8(g) and (h). The prosecutor's office should develop policies and procedures to address such information, and take actions that are consistent with applicable law, rules, and the duty to pursue justice." ABA Standards for Criminal Justice, The Prosecution Function, Standard 3-8.3 (4th ed. 2017).

Section 3.8(g) of the ABA Model Rules of Professional Conduct provides as follows:

> "(g) When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall:

> (1) promptly disclose that evidence to an appropriate court or authority, and
>
> (2) if the conviction was obtained in the prosecutor's jurisdiction,
>
> > (i) promptly disclose that evidence to the defendant unless a court authorizes delay, and
> >
> > (ii) undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit." (Emphasis added.) Model Rules of Prof'l Conduct 3.8(g) (Am. Bar Ass'n 2008).

¶ 54    Although the ABA standards are not mandatory, they serve as important guidelines in determining the reasonable and prevailing norms of practice. See generally *Strickland v. Washington*, 466 U.S. 668, 688 (1984). These standards underscore the critical role of prosecutors in addressing inadequacies or injustices in the criminal justice system by initiating remedial action to improve the administration of justice. Thus, prosecutors have a responsibility to protect against witness intimidation and coercion by police officers and to investigate when credible allegations of such police misconduct are made.

¶ 55    Where, as here, there has been a recurrence of complaints of intimidation and coercion from multiple witnesses in the same investigation, the prosecutor has an obligation to investigate those allegations to ascertain whether the statements and grand jury testimony identifying petitioner as the offender were the product of witness intimidation or coercion. In my view, the State's Attorney is duty bound to undertake that investigation, and I encourage her to do so. See *People v. Hauad*, 2016 IL App (1st) 150583, ¶¶ 68-69.