2021 IL App (1st) 190685-U

No. 1-19-0685

Order filed July 13, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 90 CR 17117 |
| | ) | |
| FREDDY MAGNUS, | ) | The Honorable |
| | ) | Angela M. Petrone and |
| Defendant-Appellant. | ) | John E. Morrissey, |
| | ) | Judges Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

ORDER

¶ 1    *Held*: The trial court erroneously denied defendant leave to file his successive petition under the Act where defendant demonstrated cause and prejudice with respect to his assertion that his sentence violated the eighth amendment.

¶ 2    Defendant Freddy Magnus appeals from the trial court's order denying him leave to file a

successive petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*

(West 2012)). On appeal, defendant asserts that he satisfied the cause and prejudice test with

respect to his contention that his 75-year prison term for two murders committed as a 16-year-old violated the eighth amendment pursuant to *Miller v. Alabama*, 567 U.S. 460, 471 (2012)), and its progeny. Under these circumstances, we agree.

¶ 3                                                    I. Background

¶ 4        At trial, the State's evidence showed that on July 3, 1990, Garland Darnell Grant and Derrick Lofton were walking with their girlfriends in the area of Bessemer Park, Latin Kings territory. Grant and Lofton were members of a rival gang, the Disciples, who were in turn affiliated with the "Folks." Grant's hat was turned to the right to signify his association.

¶ 5        Defendant, a Latin King, was also in the area with his younger brother Ernest. Ernest twice called for Grant to straighten his hat before stepping out from a shadow. Ernest said, "[y]ou must be Folks." He repeated his order and pushed Grant, who then removed his hat. When the couples tried to leave, Ernest blocked their path.

¶ 6        Defendant emerged from an alley, approached the group with his hand under his shirt and asked Ernest if the men were "Folks." Ernest then punched Grant. When Grant raised his fists, defendant shot him in the back. Defendant then shot Lofton in the chest and pointed the gun at Lofton's girlfriend.  When she begged for her life, however, defendant fled. Neither Grant nor Lofton survived.

¶ 7        In contrast, defendant testified that he saw Grant punch Ernest in the face and saw Lofton reach for something and move toward Ernest. Defendant shot the victims out of fear for his brother's safety. Yet, he acknowledged that he never saw the victims with a weapon.

¶ 8        The trial court found defendant guilty of the first-degree murder of Lofton and the second-degree murder of Grant.

¶ 9    At sentencing, the State argued that the offense was egregious and that while this was defendant's first adult conviction, he had previously been adjudicated a delinquent and committed to the Juvenile Department of Corrections. No presentence investigation (PSI) )report was created in this case and the record does not otherwise reveal the nature of his juvenile adjudication.

¶ 10    In mitigation, defense counsel argued that defendant was only 16 years old at the time of the offense, had an eighth-grade education and never knew his father. We note that defendant had actually testified at trial that he lived with his father. Defense counsel also argued that defendant, his two brothers, his sister and his mother survived on welfare, notwithstanding defendant's employment at Windy City Meat Company. Additionally, defense counsel argued that it was unfortunately common for juveniles in defendant's circumstances in his neighborhood join a gang. Defense counsel questioned how much of a chance defendant had been given in life and requested a sentence that would give defendant incentive to consider his own rehabilitation.

¶ 11    The trial court then sentenced defendant to 60 years' imprisonment for first-degree murder, the maximum permissible sentence (Ill. Rev. Stat. 1991, Ch. 38, par. 1005-8-1(a)). The court also imposed the maximum extended term for second-degree murder, 30 years (Ill. Rev. Stat. 1991, Ch. 38, Pars. 1005-5-3.2(b)(2), 1005-8-2(a)), to be served consecutively to his 60-year prison term. The court found that defendant had shown some remorse, but the case involved an urban tragedy in which defendant ruined his own life and ended the lives of two others. The court stated, "Mr. Magnus, as long as there is [*sic*] young aimless persons with handguns, this stuff is going to go on." The court found there was very little mitigation. In support of the court's decision to impose consecutive sentences, the court found that "this kind of sentence was necessary to protect the public from further criminal conduct of the defendant given the fact that

Freddie Magnus was 16 years of age, in the Latin Kings street gang and was walking about the streets armed with a handgun." The court stated, "[y]ou were and are a dangerous young man, Mr. Magnus." Furthermore, the court observed that while the sentence was "most harsh," defendant might have the opportunity to be released someday and spend his later years as a free man.

¶ 12    On direct appeal, defendant challenged the consecutive nature of his sentences as well as the imposition of an extended-term sentence for second-degree murder. The reviewing court agreed that the trial court erroneously imposed an extended-term sentence for second-degree murder and reduced that sentence to 15 years' imprisonment, the maximum regular term available at that time. The reviewing court rejected defendant's remaining contention. *People v. Magnus*, 262 Ill. App. 3d 362 (1994).

¶ 13    In August 2001, the trial court dismissed defendant's first petition under the Act as frivolous and patently without merit, rejecting his assertion that his sentence was unconstitutional under *Apprendi v. New Jersey,* 530 U.S. 466 (2000). That decision was affirmed on appeal, after appointed counsel was permitted to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Magnus*, 1-01-3466 (May 6, 2003) (unpublished order under Supreme Court Rule 23).

¶ 14    In July 2018, defendant filed the present motion seeking leave to file a successive petition under the Act. Citing the eighth amendment and *Miller*, defendant argued that his *de facto* life sentence was unconstitutional and entitled him to resentencing. Pertinent to this appeal, defendant argued that he received a *de facto* life sentence without the sentencing judge taking "into account his youth and its attendant characteristics and how he was different from adults,

and how these differences counseled against" a life sentence. In addition, his crime reflected the transient immaturity of youth, not permanent incorrigibility.

¶ 15    On February 5, 2019, the trial court denied defendant leave to file his successive petition. The court found that while new case law demonstrated cause for not raising this matter sooner, defendant could not establish prejudice. Defendant now appeals.

¶ 16                                   II. Analysis

¶ 17    The Act provides a mechanism for defendants to assert substantial denials of their constitutional rights at trial. *People v. Jackson*, 2021 IL 124818, ¶ 27. Yet, a defendant must obtain leave of court to file a successive petition under the Act. *People v. Wrice*, 2012 IL 111860, ¶ 47. Courts will relax the prohibition against successive filing where a defendant satisfies the cause and prejudice test. *Jackson*, 2021 IL 124818, ¶ 27. Cause requires an objective factor impeding the defendant's ability to raise a claim during his initial postconviction proceedings whereas prejudice requires a showing that the claim so infected the trial that his resulting conviction or sentence violated due process. *People v. Lusby*, 2020 IL 124046, ¶ 27. We review the trial court's denial of leave to file a successive petition *de novo*. *Id*.

¶ 18    Here, the State concedes that defendant has satisfied the cause prong. Accordingly, we consider whether defendant has demonstrated prejudice.

¶ 19    Under the eighth amendment, children are constitutionally different from adults for sentencing purposes. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Because juveniles are not mature and lack a fully developed sense of responsibility, they engage in dangerous, reckless, impulsive behavior. *People v. Buffer*, 2019 IL 122327, ¶ 16.  They are also vulnerable to negative influences and outside pressures while lacking the ability to extricate themselves from

settings that produce crime. *Id.* Because juveniles are more capable of change than adults, their conduct is also less likely to reflect irretrievable depravity. *Id.*

¶ 20    With these considerations in mind, the United States Supreme Court has held that the eighth amendment prohibits **mandatory life sentences for juveniles convicted of murder.** *Miller*, 567 U.S. at 489. To prevail on a *Miller*-based claim, a defendant must show that (1) he received a life sentence, "mandatory or discretionary, natural or *de facto*," for crimes committed as a juvenile and (2) the sentencing court failed to first consider his youth and its attendant characteristics. *Buffer*, 2019 IL 122327, ¶ 27. The parties initially dispute whether defendant received a life sentence.

¶ 21    For purposes of juvenile sentencing, a term of years may constitute a *de facto* life sentence. *People v. Reyes*, 2016 IL 119271, ¶ 10. The Illinois Supreme Court has drawn the line at 40 years. *Buffer*, 2019 IL 122327, ¶ 40. According to the State, however, courts must consider available sentencing credit in determining whether defendant's sentence exceeds 40 years in prison. The State contends that defendant did not receive a *de facto* life sentence here because when available sentencing credit is applied, defendant will be released in less than 40 years.[1]

¶ 22    As the State acknowledges, this court has repeatedly disregarded a defendant's eligibility for sentencing credit when determining whether he received a *de facto* life sentence. See, *e.g.*, *People v. Simental*, 2021 IL App (2d) 190649, ¶ 20; *People v. Thorton*, 2020 IL App (1st) 170677, ¶ 22; but see *People v. Derrell Dorsey*, 2017 IL App (1st) 151124-U, ¶ 29, pet. for leave to appeal allowed, No. 123010 (Mar. 25, 2020) (considering the defendant's potential sentencing

---

[1]Because defendant was sentenced before the truth-in-sentencing law took effect, he was eligible for day-for-day good conduct credit. Ill.Rev.Stat.1991, Ch. 38, par. 1003–6–3(a)(2).)

credit in determining whether he received a *de facto* life sentence). Until our supreme court rules otherwise, we adhere to those decisions. Accordingly, defendant's cumulative 75-year prison term qualifies as a *de facto* life sentence.

¶ 23    We now consider whether the sentencing court failed to consider defendant's youth and attendant characteristics.

¶ 24    A sentencing court may impose a life sentence "but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46. To be able to make that determination, a court must first consider a defendant's youth and attendant characteristics, *i.e.*, the *Miller* factors. *Lusby*, 2020 IL 124046, ¶ 34. Those factors include (1) the defendant's age and evidence of his particular impetuosity, immaturity and failure to comprehend risks and consequences; (2) his family and home environment; (3) his degree of participation in the offense and any evidence of familial or peer pressure; (4) his incompetence, including any inability to assist defense counsel or deal with the police and prosecutors; and (5) his prospects of rehabilitation. *Id.*

¶ 25    As the State concedes, the trial court did not expressly find defendant showed "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. We cannot say that the court implicitly made that finding either. Specifically, the court stated, "You were and are a dangerous young man, Mr. Magnus." The court did not state that defendant would forever be dangerous, impervious to rehabilitation.

¶ 26    Recently, in *Lusby*, our supreme court examined what evidence the trial court had before it as to each *Miller* factor in determining whether the defendant's sentencing hearing was

constitutionally adequate. *Lusby*, 2020 IL 124046, ¶¶ 35-36. The PSI report in that case played a significant role in the supreme court's analysis. See *id*. ¶¶ 37-40. While no PSI was created here, we nonetheless follow *Lusby's* example and consider what information the sentencing court had before it as to each of the five *Miller* factors, saving the fourth factor for last.

¶ 27    First, the trial court clearly knew defendant's age, and was aware that the crime was spontaneous. As to the second factor, defendant's family and environment, defense counsel argued that defendant grew up with two brothers, a sister and a mother but no father, in contrast to defendant's testimony that he lived with both his mother and father. In addition, defense counsel noted that defendant's "sisters and brother-in-law" were in court. The record was silent as to the quality of defendant's relationships with his various family members, however. Defense counsel argued that defendant's family suffered from poverty but otherwise offered no information as to his environment. Neither did the State.

¶ 28    Next, the sentencing court was clearly aware that defendant was the sole perpetrator in this gang-related crime. Even if defendant's fellow gang members were not present, peer pressure may nonetheless have played a role. In addition, the record is silent as to whether Ernest was a Latin King. Furthermore, the sentencing court knew that Ernest was defendant's younger brother. Indeed, defendant essentially testified that he shot the victims to protect his brother.

¶ 29    We also find that nothing in this record supports a finding that defendant is incapable of rehabilitation. This was defendant's first adult offense, and we lack any information regarding the nature of his juvenile adjudication. Notably, the sentencing court found defendant had shown some form of remorse. Moreover, defendant spared Lofton's girlfriend when she begged for her life.

¶ 30     Finally, we find that defendant's youth, when considered alongside certain procedural anomalies in this case, would have limited his ability to assist in his defense.

¶ 31     Defendant's trial began in front of a jury, after defendant had apparently rejected a plea offer from the State. In the middle of trial, a plea conference occurred between defendant and the court, over the State's objection, to see if an agreement could be reached. The court's admonishments prior to the conference blurred the concept of waiving a jury trial and the concept of participating in a plea conference. When the trial court told defendant that the court would "learn something of your personal background, any juvenile record you may have had" at such a conference, defendant initially chose to forgo the conference and continue with trial. Following a recess, defense counsel stated that he had explained the substance of the court's comments and that defendant understood the court's meaning. Having read those comments, we find any understanding had to have come from defense counsel.

¶ 32     Following the conference, no record was made of any agreement having been reached. Defendant waived his right to a jury and the trial continued before the bench, which found defendant guilty. Defense counsel and the prosecutor agreed to proceed immediately to sentencing, without even the mention of a PSI report.

¶ 33     At sentencing, the court stated, "I guess by winding up the trial in the manner that we did and by proceeding to an agreed upon sentencing hearing, which for the record was involved, some remorse has been shown here." We can surmise that the court's reference to the "manner" of trial reflected defendant's stipulation to certain testimony. The record sheds no light, however, on what aspect of sentencing could have been characterized as "involved."

¶ 34     We find it difficult to believe that defendant, facing his first adult proceeding and having only an eighth-grade education, would be able to understand what was happening let alone

meaningfully assist in his case. Moreover, it is unclear whether defendant understood what defense counsel was forgoing by not insisting on the preparation of a PSI report.

¶ 35     Having examined the information available with respect to each *Miller* factor, we find the sentencing court lacked adequate information to justify a *de facto* life sentence. Although that court may have learned additional relevant information at the off-the-record plea conference, we cannot assume that it did for purposes of the eighth amendment. Defendant has established prejudice.

¶ 36     Ordinarily, we would reverse and remand for second-stage proceedings under the Act. See *People v. Robinson*, 2020 IL 123849,  ¶ 43. However, it is clear from this record that these sentencing proceedings did not pass muster under *Miller*. See *People v. Buffer*, 2019 IL 122327, ¶¶ 46, 47.  Accordingly, we reverse and remand to the trial court for resentencing. *People v. Jackson*, 2020 IL App (1st) 143025-B ¶ 57.

¶ 37     Reversed and remanded for resentencing.