NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 220331-U

NO. 4-22-0331

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 1, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ALEXANDER V. BEARD, | ) | No. 13CF1263 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice DeArmond and Justice Harris concurred in the judgment.

**ORDER**

¶ 1     *Held:*  The appellate court affirmed the trial court's denial of defendant's motion for leave to file a successive postconviction petition alleging actual innocence because the affidavits he presented were not newly discovered evidence.

¶ 2     In December 2013, a jury found defendant, Alexander V. Beard, guilty of three counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2012)) and one count of predatory criminal sexual assault of a child (*id.* § 11-1.40(a)(1)), for which the trial court sentenced defendant to a total of 18 years in prison. Defendant appealed, and this court affirmed. *People v. Beard*, 2016 IL App (4th) 140286-U (*Beard I*).

¶ 3     In November 2017, defendant *pro se* filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), which the trial court dismissed because defendant had already raised the same issues in his direct appeal. This court affirmed the trial court's decision. *People v. Beard*, 2020 IL App (4th) 180120-U (*Beard II*).

¶ 4        In November 2021, defendant filed a motion for leave to file a successive postconviction petition under the Act (725 ILCS 5/122-1(f) (West 2020)), claiming actual innocence, in part because he had newly discovered evidence in the form of affidavits. The trial court denied the motion.

¶ 5        Defendant appeals, arguing that the trial court erred by denying his motion for leave to file a successive postconviction petition because the "affidavits were material, non-cumulative, and place the trial evidence in a different light while undermining confidence in the jury's verdicts." We disagree and affirm the trial court's decision.

¶ 6                                I. BACKGROUND

¶ 7                        A. The Charges Against Defendant

¶ 8        In October 2013, the State charged defendant, age 33, with (1) four counts of aggravated criminal sexual abuse and (2) one count of predatory criminal sexual assault. The charges alleged, generally, that "on or about the *1st day of April 2013 through the 1st day of July 2013*," defendant, being at least 17 years old, on four different occasions committed an act of sexual conduct with S.W., a minor under 13 years of age. Before trial, the State dismissed one of the counts of criminal sexual abuse.

¶ 9                                B. The Jury Trial

¶ 10        In December 2013, prior to the jury trial, both sides stipulated to the admission of a videotaped interview of S.W. in July 2012 at the McLean County Children's Advocacy Center (CAC). During the interview, S.W. described four incidents of sexual abuse that she said happened about two months before the CAC interview and about a month before school let out for the summer when she was 12 years old.

¶ 11        Later that month, the trial court conducted defendant's jury trial.

¶ 12                                          1. *S.W.*

¶ 13          S.W. testified that defendant lived with Candace, a neighbor, along with Candace's

son (Estaban), defendant's girlfriend (Amanda Harris), and Amanda's two children (Dontae and

Damien Harris). S.W. would often go over to Candace's apartment to play video games or wrestle

with the boys. S.W. testified to four instances of sexual abuse by defendant.

¶ 14          In the first instance, S.W. was in Esteban's room at Candace's apartment wrestling

with Esteban and defendant. Esteban left the room to use the restroom. When he left, defendant

lay on top of her and would not let her up. He rubbed his penis on her vagina. She clarified that

they were both clothed at the time. When asked what it felt like when defendant was rubbing his

penis on her, she stated, "Like it was poking me, and it hurt." She asked him to get off of her, but

he stopped only when she pushed him off.

¶ 15          The second incident also occurred at Candace's apartment while S.W. was there

with Esteban, the other boys, and defendant. S.W. was "lining" defendant's hair with clippers in

the upstairs bathroom. She then asked him to leave so she could use the bathroom. Defendant left

but then reentered while she was on the toilet. He then pulled his pants down and "just started to

wash his body up." S.W. asked defendant to leave, but he did not. He pulled her pants down and

forced her to lie on the floor, rubbing his penis on the outside of her vagina. She asked defendant

to get off of her, but he did not stop until she "kind of kicked him in his balls."

¶ 16          Sometime after the first two incidents, S.W. and defendant were at a park playing

basketball when defendant took S.W. to the softball field dugouts and "tried to make [her] touch

on his penis." She told him she did not "think [she] should do that cause that's inappropriate for

[her] to do that to a grown man." S.W. testified that she did not touch him. Instead, they went back

to playing basketball.

¶ 17        The final incident occurred when defendant took S.W. to get soda and snacks in his van and pulled behind a store. S.W. had asked defendant to take her to Circle K, a convenience store, and defendant agreed. Instead of driving S.W. to Circle K, defendant drove to Family Dollar and parked behind the store. Defendant touched her leg as S.W. sat in the front passenger seat but stopped when she asked him to. However, defendant then pulled his pants down, pulled her pants down, and rubbed his penis on her vagina outside of her underwear. He then pulled her underwear down and rubbed his penis on her vagina. She asked him to stop, but he did not stop until she pushed him away. He then drove her home.

¶ 18        S.W. testified to a rough timeline of the events but could not remember the specific amount of time between each incident.

¶ 19                    2. *S.W.'s Interview*

¶ 20        Jacob Walters testified that he was employed by CAC and conducted a forensic interview of S.W. in July 2012. The jury was allowed to view a video recording of the interview, in which S.W.'s description of the incidents largely comported with her trial testimony. Her statements during the interview, however, differed from her trial testimony in the following ways: (1) regarding the incident in Esteban's room, S.W. said during the interview that defendant stopped when Esteban returned to the room, but at trial she said he stopped when she pushed him off; (2) regarding the incident in the bathroom, S.W. said during the interview that defendant stopped when someone knocked on the door but at trial she said defendant stopped rubbing on her only after she "kind of kicked him in his balls"; (3) regarding the incident at the Family Dollar, S.W. did not mention defendant touching her vagina with his penis during the interview; and (4) regarding the incident at the park, S.W. provided less detail during the interview than she did during the trial.

¶ 21        The jury found defendant guilty of three counts of aggravated criminal sexual abuse and one count of predatory criminal sexual assault.

¶ 22                              C. The Sentencing Hearing

¶ 23        In January 2014, the trial court conducted a hearing on posttrial motions and sentencing. The court began by addressing defendant's allegations of ineffective assistance of trial counsel, which defendant *pro se* raised through a letter he had mailed to the court. The following colloquy then took place:

> "[THE COURT:] Now, in your letter, you indicate, first of all, that, and I'll just read what you wrote, that [trial counsel] excluded witnesses that were mentioned by the alleged victim during trial. I'll be honest with you, I'm not sure what you mean by excluded witnesses, and I don't know what witnesses you're referring to, so, if you would like, you can explain to me a little bit better what you mean by that sentence. What is it that you think [trial counsel] either did or didn't do with regard to that allegation that somehow prejudiced you during the trial?
>
> [DEFENDANT]: Like as far as excluding the kids that were actually mentioned, that were actually in the household at the time.
>
> ***
>
> [DEFENDANT]: And I actually requested him to call them upon as witnesses.
>
> THE COURT: Okay, so you're talking about the minor children that were referred to as being present and sometimes with the victim and sometimes in the apartment that you lived in and so forth?
>
> [DEFENDANT]: Right, supposedly at the time of the incident.

THE COURT: So, you asked [trial counsel] to investigate that and talk to those children and see if they would be appropriate witnesses?

[DEFENDANT]: Right.

* * *

THE COURT: But he chose not to call those witnesses?

[DEFENDANT]: Right.

THE COURT: Did you and he discuss that decision?

[DEFENDANT]: No.

THE COURT: Okay. But you did ask him to investigate whether those would be appropriate witnesses?

[DEFENDANT]: Right, yeah.

THE COURT: Okay. And, just generally, if you can tell me, what, if any, testimony or evidence do you believe those minor children would have been able to provide that would have assisted you in your defense?

[DEFENDANT]: They could have provided if it was—the accusations were actually true because she actually mentioned saying, well, a couple of kids went to go drink some water and somebody knocked on the door at the time of actually two of those incidents. They could provide whether that was true or not.

THE COURT: Okay. So, you believe that they may have been able to give some additional information on that."

¶ 24    Defendant also indicated that defense counsel did not call two police officers as witnesses, whose names were unknown to defendant. Defendant stated that the police officers had personal knowledge about the incident at the park that defendant believed would have

clarified what occurred that day. He also believed that trial counsel should have asked him more questions to help him impeach the victim's testimony.

¶ 25 Trial counsel responded to defendant's allegations regarding the child witnesses by stating the following:

"Briefly, Your Honor. In regards to the first allegation that I excluded child witnesses, the defendant did mention, and I think it came out in the testimony of the victim, that one of the children was downstairs during—when this first incident allegedly happened, and she went downstairs after this allegedly happened and played with that child. There was no evidence that that child was an occurrence witness. There wasn't—didn't have any testimony about what may have taken place upstairs. And in terms of the defendant's allegation that the child could testify in detail about whether they knocked on the door or what actions took place inside the apartment on that date, unfortunately, the testimony of the alleged victim was uncertain as to date. There was no specific date. And we could not develop an alibi defense based on the fact that the victim said that these incidents occurred sometime she believed in May shortly before she went on vacation, school vacation. But, I did talk about the fact that those witnesses as children would have nothing of evidentiary value to add. I talked to Amanda Harris, the children's mother, about that and I made a decision not to call them because I didn't feel they could have offered any help through testimony."

¶ 26 After hearing from trial counsel and defendant, the trial court found that counsel's representation of defendant was not deficient. The court explained, in part, the following:

"[Trial counsel] has given me what I think are very sound reasons for why

he did not call certain witnesses, how they would not have assisted in your defense, especially the children here, that the issues that you've raised here about this whole Miller Park thing, and I do recall on cross-examination when you were being cross-examined by the State, there was some reference to the Miller Park thing. But that's what we call a collateral issue. It's really not relevant to the actual charges. It's kind of a separate issue, and once again, [trial counsel] made the tactical decision that pursuing that was not going to assist you, and I haven't heard anything to suggest otherwise at this point."

¶ 27        The trial court then conducted the sentencing hearing and sentenced defendant to a total of 18 years in prison.

¶ 28                        D. The Direct Appeal

¶ 29        In February 2016, on direct appeal, this court affirmed, holding that (1) the evidence was sufficient to sustain defendant's convictions, (2) the trial court did not err by admitting hearsay statements of the child victim, and (3) the trial court did not err by declining to appoint new counsel after defendant claimed he received ineffective assistance of trial counsel. *Beard I*, 2016 IL App (4th) 140286-U, ¶ 2.

¶ 30                    E. The Postconviction Petition

¶ 31        In November 2017, defendant *pro se* filed a petition for postconviction relief, arguing that the trial court (1) violated his sixth amendment rights by admitting hearsay statements of S.W. at trial and (2) failed to appoint new counsel based on his trial counsel's failure to properly investigate, impeach State witnesses, and establish an alibi defense. The court dismissed defendant's petition at the first stage because this court had already rejected those claims on direct appeal in *Beard I*. Defendant appealed, and this court affirmed. *Beard II*, 2020 IL App (4th)

180120-U, ¶¶ 1-2.

¶ 32                     F. The Successive Postconviction Petitions

¶ 33         In June 2020, defendant filed his first motion for leave to file a successive postconviction petition, which the trial court denied in September 2020. On appeal, this court affirmed. *People v. Beard*, No. 4-21-0058 (2022) (unpublished summary order under Illinois Supreme Court Rule 23(c)) (*Beard III*).

¶ 34         In November 2021, defendant filed his second motion for leave to file a successive postconviction petition, predicated on a claim of actual innocence. Defendant attached affidavits from himself, Dontae Harris, and Damien Harris, which defendant alleged to be newly discovered evidence that was of such a conclusive character that it would probably change the result on retrial.

¶ 35         The affidavits from Dontae and Damien each averred that they had lived with defendant at Candace's apartment until April 18, 2013, at which point they and defendant moved away. Both affiants asserted, in part, that (1) S.W. was never alone in the house with defendant, (2) S.W. had a reputation for lying, and (3) they were prepared to give statements at the trial but defense counsel never spoke to them about those statements.

¶ 36         In February 2022, the trial court denied defendant's motion, explaining the following:

> "The Court finds that the affidavits and exhibits attached to [defendant's motion] are not newly discovered. These witnesses were known to [defendant] prior to trial. *** [Defendant] allegedly lived with these witnesses at the time the abuse and assaults allegedly occurred. ***
>
> The Court finds the evidence is cumulative. These witnesses' testimony will be that [defendant] could not have committed the abuse/assault because they did

not see him alone with the victim. This was [defendant's] defense at trial. He testified. These witnesses would simply add to what he has already stated.

*** The State's allegations allege that the acts took place between the first day of April, 2013 through the 1st day of July, 2013. Petitioner even asserts that the [v]ictim was around for a substantial period of time and was told to go home several times. Defendant even testified at trial about a trip to Circle K where he and the [v]ictim were alone. *** The affidavits further assert that the [v]ictim was in a relationship with another person named Luke. ***

*** Petitioner's Motion is Denied."

¶ 37    This appeal followed.

¶ 38                    II. ANALYSIS

¶ 39    Defendant appeals, arguing that the trial court erred by denying his motion for leave to file a successive postconviction petition because the "affidavits were material, non-cumulative, and place the trial evidence in a different light while undermining confidence in the jury's verdicts." We disagree and affirm the trial court's decision.

¶ 40            A. The Applicable Law and the Standard of Review

¶ 41    The Act provides a method by which a defendant can assert that his conviction was the result of a substantial denial of his constitutional rights. *People v. Jackson*, 2021 IL 124818, ¶ 27, 182 N.E.3d 594. To be entitled to postconviction relief, a defendant must show that he or she has suffered a substantial deprivation of his or her federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. 725 ILCS 5/122-1(a)(1) (West 2020).

¶ 42    "The Act contemplates the filing of only a single [postconviction] petition."

*Jackson*, 2021 IL 124818, ¶ 27. However, successive postconviction petitions are allowed in two situations. *Id.* "First, a defendant may raise a constitutional claim by satisfying the cause-and-prejudice test. [Citations.] Second, even without showing cause and prejudice, a defendant may assert a claim of actual innocence pursuant to *People v. Washington*, 171 Ill. 2d 475[, 665 N.E.2d 1330] (1996)." *Id.* "To establish a claim of actual innocence, the supporting evidence must be newly discovered, material and not cumulative, and of such conclusive character that it would probably change the result on retrial." *Id.* ¶ 41.

¶ 43　　　　"Prior to [filing] a successive postconviction petition, a petitioner must obtain leave of [the trial] court." *People v. Robinson*, 2020 IL 123849, ¶ 43, 181 N.E.3d 37. A motion for leave to file a successive postconviction petition should be denied only if, as a matter of law, the petition cannot set forth a colorable claim of actual innocence. *Jackson*, 2021 IL 124818, ¶ 41. Accordingly, "the denial of leave to file a successive postconviction petition alleging actual innocence is reviewed *de novo*." *Robinson*, 2020 IL 123849, ¶ 40.

¶ 44　　　　　　　　　　　　　　B. This Case

¶ 45　　　　At issue here are affidavits from Dontae and Damien, which defendant contends establish his actual innocence. In short, the affiants averred that S.W. was never alone in the house with defendant, S.W. had a reputation for lying, and Dontae and Damien were prepared to give statements in court but defense counsel never spoke to them about those statements. Defendant argues that these affidavits are newly discovered evidence that "unambiguously rebut S.W.'s claims of repeatedly being alone with [defendant] in Candace's house" and thus call into dispute at least two of defendant's convictions. We disagree because the affidavits are not newly discovered evidence.

¶ 46　　　　In *People v. Fields*, 2020 IL App (1st) 151735, ¶¶ 46, 48, 175 N.E.3d 1131, the

First District explained what constitutes newly discovered evidence and wrote the following:

> "Newly discovered evidence is evidence that could not have been obtained earlier through due diligence. [Citation.] It includes testimony from a witness who 'essentially made himself [or herself] unavailable as a witness' by moving out of state [citation] or who had been made unavailable through threats or intimidation to not testify. [Citation.] ***.
>
> ***
>
> In an actual innocence claim, it is 'the evidence in support of the claim' that 'must be "newly discovered," ' not necessarily the source. [Citation.] As a result, an affidavit from a witness may be newly discovered, even when the defense knew of the witness prior to trial. [Citation.] If 'no amount of [due] diligence by defendant could have compelled [the witness] to testify to the statements in his affidavit' at trial, then the affidavit constitutes newly discovered evidence."

¶ 47    Defendant cites *People v. Ortiz*, 235 Ill. 2d 319, 334, 919 N.E.2d 941, 950 (2009), to support his claim that the affidavits are newly discovered evidence. However, the record in *Ortiz* could not be more different from that in this case. In *Ortiz*, the appellate court concluded that an affidavit was newly discovered evidence because the witness (1) did not admit to witnessing the crime until 10 years after the trial, (2) could not have been seen by defendant when the crime was committed, and (3) "essentially made himself unavailable as a witness when he moved to Wisconsin shortly after the murder." *Id.*

¶ 48    Unlike in *Ortiz*, as defendant notes in his brief, Dontae and Damien were on the witness list for defendant's trial, and the record shows that they even lived with defendant. Far from being unavailable, they averred that they were ready to testify on defendant's behalf. They

were even present in the courthouse on the day of the trial.

¶ 49　　　　In addition, during a *Krankel* inquiry (see *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)) regarding trial counsel's alleged ineffective assistance for not calling the brothers as witnesses, defendant discussed briefly with the trial court what he believed Dontae and Damien would have testified to—namely, whether S.W.'s accusations were true regarding at least two of the incidents in the house. The relevant portions of the affidavits are in effect the same testimony that defendant described at the *Krankel* hearing. That fact, along with the affiants being on the witness list and living with defendant, clearly shows the affidavits are not newly discovered evidence.

¶ 50　　　　Because we have determined that the affidavits are not newly discovered, defendant's claim fails. Accordingly, we need not address his arguments that the affidavits were material and noncumulative.

¶ 51　　　　　　　　　　　　　　III. CONCLUSION

¶ 52　　　　For the reasons stated, we affirm the trial court's decision.

¶ 53　　　　Affirmed.