2022 IL App (2d) 190931-U
No. 2-19-0931
Order filed January 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 06-CF-2363 |
| RYAN T. HARMON, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Trial court did not err in denying defendant's motion for leave to file a successive postconviction petition. Therefore, we affirm.

¶ 2    Following a jury trial, defendant, Ryan T. Harmon, was convicted of three counts of aggravated kidnaping (720 ILCS 5/10-2(a) (West 2006)) and one count of arson (720 ILCS 5/20-1(a) (West 2006)). He currently appeals from the trial court's denial of his motion for leave to file a successive postconviction petition. We affirm.

¶ 3                              I. BACKGROUND

¶ 4    We previously summarized the evidence adduced at trial in defendant's two prior appeals (see *People v. Harmon*, 2013 IL App (2d) 120439; *People v. Harmon*, 2011 IL App (2d) 091278-U), and we again restate the relevant facts here.

¶ 5    Witness testimony began on May 19, 2009. According to evidence presented by the State, then-16-year-old Michael Feehan left the Billiard Café in Rockford on June 2, 2006, at about 11:50 p.m. He got into his car, a 1992 maroon Buick, and put his wallet, cell phone, and pool cue on the passenger seat. Two black men, later identified as then-17-year-old defendant and Kenneth Chandler, approached; defendant went to the driver side window and Chandler went to the passenger-side window. Feehan had never seen the men before. Feehan rolled down his window, and defendant asked if he had a lighter. Feehan said that he did not smoke. Defendant then asked if he had any alcohol. Feehan said no, and he said that he would give them some money to buy a lighter at the gas station across the street. Feehan reached over to get his wallet, and when he turned to look back, defendant punched him in the left side of the face, knocking out some teeth.

¶ 6    The men dragged Feehan out of the car and hit and kicked him, telling him to get into the trunk. Feehan complied because they threatened to kill him otherwise. The men searched Feehan for his wallet, and after he told them that it was in the car, they closed the trunk. They drove off, with Feehan screaming from the trunk. Feehan heard them talking to people during some stops, and he also heard them talking to people using the speaker phone on his cell phone.

¶ 7    After several hours, the men popped the trunk and put Feehan's pool cue "over the bed of the trunk" so that he could not sit up or move. They told him that if he did not stop making noise they would kill him, but if he stopped, he would make it through. Feehan saw that defendant had duct tape with blood seeping through it on his left hand; defendant did not have that on his hand before he punched defendant. The men closed the trunk again. For the majority of the time that

Feehan was in the trunk, the car was moving and Feehan was awake, though he fell asleep at some point.

¶ 8    The next morning, Feehan asked for food and water, and the men stopped and gave him food and water from McDonald's while he was still in the trunk. Later, he heard them driving on a gravel road that he felt they had already been on, but this time they stopped and popped the trunk and started tying him up with duct tape. They were near an abandoned house in a forested area. The men threw Feehan into an outhouse on the property and used branches to secure the door. They told Feehan that they were going to come back, and if he tried to escape and they found him, they would kill him.

¶ 9    After the men drove off, Feehan freed himself from the duct tape and got the door open. He ran to a house and found some people outside. They helped him call the police and his family. Feehan's father drove him to the hospital, where he was diagnosed with having multiple blunt contusions to his chest and face, a large abrasion on his upper lip, and a fractured front incisor. Feehan identified defendant in a photo lineup and in court.

¶ 10    On June 4, 2006, the police located Feehan's Buick in a wooded area near an intersection. There were two sets of tire marks in a grassy area, showing that two vehicles had been there. The Buick's interior had smoke and heat damage, and a small area in the backseat was burned. A gas can was in the front seat, with a pair of gloves under it. A partially burnt piece of paper, Feehan's class schedule, was outside on the ground next to the passenger side of the car. An arson investigator testified that the fire originated in the backseat and was intentionally set. He opined that the fire died out from a lack of oxygen because all of the car's windows and doors were closed. Inside the trunk, the police located a half-eaten burger and a cup from McDonald's, as well as a bag from McDonald's containing a receipt. Pictures from McDonald's security video cameras

from a time corresponding to that indicated on the receipt showed a man, identified as defendant, purchasing food. The pictures also showed gauze or duct tape on his left hand.

¶ 11    An expert in fingerprint analysis and comparison testified that he recovered one latent fingerprint from the outside of the driver's-side window, which he matched to Chandler, and one latent print from the back of the school schedule, which he matched to defendant's left thumb.

¶ 12    Defendant provided the following testimony. He was helping his aunt move on "Thursday" and "Friday" (June 2 and 3, 2006), and he cut his hand on Friday while helping move a couch. Therefore, his hand was wrapped in gauze and tape. Also on Friday, Chandler, a friend of defendant's, called and told him that he had just come back from Texas. The following day, Chandler picked him up in a maroon Buick, and defendant was with him for about 1½ hours. During that time, they drove to Chandler's friend's house and later picked up a few friends they saw outside. They next drove to the house of a person named Savante Brown. Defendant left Brown's house with Chandler, and Chandler asked defendant to buy some food for him at McDonald's because he was feeling lazy. Defendant admitted being in the video from McDonald's. Defendant gave Chandler the food and asked to be dropped off at his aunt's house so he could keep helping her move. He got there at about 1:30 or 2 p.m. That night, defendant "rapped" with some friends and then went home.

¶ 13    Defendant testified that he was in the front passenger's seat of the Buick when he was with Chandler. He did not remember touching any papers in the car but might have. Defendant denied striking Feehan and throwing him in the trunk.

¶ 14    On cross-examination, defendant admitted that he was left-handed. He did not recall telling police officers on July 4, 2006, that he was homeless. Defendant believed that he told the officers that he knew about a warrant for his arrest and was planning on turning himself in. Defendant did

not know if he told the officers that he had not been riding in a maroon Buick on June 2, 3, or 4. Defendant agreed that he did not tell the officers that he had hurt his hand while moving furniture.

¶ 15    In rebuttal, an officer testified that on November 6, 2003, defendant had received juvenile adjudications for attempted residential burglary and residential burglary. Another officer testified that on July 4, 2006, defendant told the police that he was homeless. Defendant denied knowing Chandler and Brown and said that he had not been in a red Buick on June 2 or 3. The officer asked if defendant got the cut on his left hand from striking Feehan, and defendant said that he did not know what the officer was talking about. Defendant also said that he did not know what the officer was talking about when asked about being seen on the McDonald's video.

¶ 16    Defendant was found guilty of six counts of aggravated kidnaping (720 ILCS 5/10-2(a) (West 2006)), one count of robbery (720 ILCS 5/18-1(a) (West 2006)), one count of vehicular hijacking (720 ILCS 5/18-3(a) (West 2006)), and one count of arson (720 ILCS 5/20-1(a) (West 2006)). Convictions were entered on three of the aggravated kidnaping counts and the arson count. Defendant was sentenced to concurrent terms of 20 years' imprisonment for the aggravated kidnaping convictions and a consecutive 5-year term for the arson conviction.

¶ 17    On appeal, defendant argued that there was insufficient evidence to prove him guilty beyond a reasonable doubt of arson, and that he was denied a fair trial when he was improperly impeached with juvenile adjudications. This court affirmed defendant's convictions. *Harmon*, 2011 IL App (2d) 091278-U.

¶ 18    Defendant filed a *pro se* postconviction petition on January 9, 2012, raising 11 claims. The trial court summarily dismissed the petition on March 20, 2012. On appeal, defendant argued that the dismissal was in error because his trial counsel was ineffective for failing to: (1) investigate Willie Gulley and call him as a witness and (2) challenge the admissibility of expert testimony that

defendant's thumbprint matched the print on Feehan's schedule. We affirmed. *Harmon*, 2013 IL App (2d) 120439.

¶ 19    On March 2, 2018, defendant filed a motion for leave to file a successive postconviction petition alleging actual innocence.[1] In addition to his own affidavit, defendant attached the affidavits of co-defendant Chandler and Nicole Collins. Defendant alleged that newly-discovered evidence strongly indicated that he had been unjustly convicted.

¶ 20    In his affidavit dated September 30, 2017, Chandler averred as follows. On June 2, 2006, he carjacked and robbed Feehan "with a person by the name of Troy Perkins." They put Feehan inside the trunk, and Perkins hit him in the mouth. They rode around with Feehan in the trunk and stopped at several places, during which time they were getting high on marijuana and drinking alcohol. After a "long time" Perkins told Chandler to drop him off and come back to get him the next morning. At that point, Chandler was alone with Feehan in the trunk. Early the next day, Chandler saw defendant walking down Oakley Street and picked him up. Defendant asked who the car belonged to, and Chandler said that it was his. Chandler told defendant to get in the car because he was "going the same way." They hung out at Chandler's girlfriend Tanisha's house for a couple of hours until it was time to pick up Perkins. "After stopping to get something to eat," Chandler dropped defendant off at his relative's house. Defendant was never aware that the car was stolen or that Feehan was in the trunk because there was loud music playing the whole time that defendant was in the car. Defendant was "truly just in the wrong place at the wrong time."

---

[1] Defendant titled his document as a postconviction petition, but within the pleading he requested leave to file the petition. On appeal, he characterizes his pleading as a motion for leave to file a successive postconviction claim, which is how the trial court treated the pleading.

Chandler "wanted to reveal this at [defendant's] trial but [he] had to look out for [his] own interest."

¶ 21    Collins averred as follows in her affidavit, dated November 27, 2017. In the summer of 2006, Troy Perkins, whom Collins knew as "Little T.P.," came to her house late at night with someone she knew as "Kenny Jr." They were in a "purplish reddish Buick or Chevy car." Perkins asked Collins to come outside, handed her $10,000 in what he said was gambling winnings, and asked her to hold the money for him. This request was not unusual because Collins had held money for Perkins in the past. Collins heard some sounds like banging coming from the car's trunk, and she asked Perkins what was going on. He said that they were playing a joke on a guy. Collins said that the man could die from a lack of oxygen, and one of the men said that they were going to let him out once they left Collins' place. About one week later, Perkins came back to get his money and told Collins that he was "on the run" because the man in the trunk had actually been the car's owner, and the man went to the police about being put in the trunk. Collins had recently seen Kenny Jr. "who contacted" her and asked if she remembered the day that he and Perkins came to her house. She said yes, and he asked if she was willing to put what she knew in an affidavit, which she did.

¶ 22    In his affidavit dated February 22, 2018, defendant averred that he did not know and had not heard that Perkins was the person with Chandler until Chandler told him the previous year. He also did not know that Collins was a witness until Chandler told him about her, and "even then [he] was not convinced until she wrote to [him]." Defendant "knew all alone [*sic*]" that Chandler had something to do with taking Feehan's vehicle and robbing him, and he tried to reach out to Chandler before trial. However, Chandler ignored defendant's plea for him to come forward, and there was nothing defendant could do about it or to prove that he himself was not involved.

¶ 23    Defendant argued that the evidence was newly discovered because he was not aware of Collins being a witness until Chandler told him about her and he received a letter and affidavit from her. He maintained that he tried to contact Chandler before trial, but Chandler ignored his plea to come forward. Defendant asserted that Chandler may have been concerned that coming forward would jeopardize his plea deal and that Chandler could be questioned about his motivations during an evidentiary hearing.

¶ 24    Defendant additionally argued that the newly discovered evidence would likely change the result on retrial because "the identification in this case wasn't strong." He argued that though Feehan identified him as the offender, Feehan was impeached by his statement to the police that the offender was 6 feet 1 inch tall, dark complected, and weighed 180 pounds, in that contrary evidence was presented at trial. Defendant also argued that although his print was found on Feehan's school schedule, defendant had admitted being in the vehicle, and the print did not prove that defendant committed the offense.

¶ 25    On September 25, 2019, the trial court issued a written order denying defendant leave to file a successive postconviction petition. We summarize the trial court's findings, in relevant part. Chandler pled guilty to kidnapping on October 3, 2007, about 1½ years before defendant's trial. Chandler was sentenced to 12.5 years' imprisonment on April 10, 2008. He was released on parole on January 20, 2017, and his projected discharge date was January 21, 2020. He was subsequently charged with possession with intent to deliver controlled substances.[2] In defendant's motion, he did not allege or aver any objective factors that impeded his ability to identify and obtain the

_____

[2] We take judicial notice that for the drug crime, Chandler's parole date was December 27, 2021, and he has a projected discharge date of December 27, 2022.

affidavits from Chandler and Collins before he filed his initial postconviction petition. Defendant did not describe any efforts he made personally or through his counsel to communicate with Chandler or obtain an affidavit from him between Chandler's guilty plea and sentencing, which occurred before defendant's trial, or between defendant's conviction and sentence and the filing of his first postconviction petition on January 9, 2012.

¶ 26     The trial court continued that Chandler's affidavit did not provide any substantial information about Perkins, such as his relationship to him, identifying characteristics, and how he could be located. Further, nothing in Chandler's affidavit asserted that Perkins bore any physical resemblance to defendant such that Feehan's identification of defendant was likely mistaken. He also did not aver that if called as a witness at defendant's trial, he would have refused to testify or would have testified consistently with the affidavit. Chandler's statement that he had to look out for his own interests was unclear given that he had already pleaded guilty and been sentenced by the time of defendant's trial. Defendant's and Chandler's affidavits did not raise the probability that the new evidence was of such a conclusive character that it would probably change the result on retrial.

¶ 27     The trial court stated that Collins' affidavit suffered from many of the same flaws regarding a lack of information about Perkins. She also did not provide information about herself or her relationship to Perkins, other than that she called him "Little T.P." Collins further did not explain why in November 2017 she had a specific memory of events on an unspecified date 11 years earlier in the summer of 2006. She did not explain why she did not come forward sooner. Most significantly, nothing in the affidavit led to the conclusion that it was more likely than not that no reasonable juror would have convicted defendant in light of Collins' " 'new evidence.' "

¶ 28     Defendant timely appealed.

¶ 29                                    II. ANALYSIS

¶ 30     The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)), which is designed to provide a statutory route for criminal defendants to challenge their convictions based on a substantial denial of constitutional rights, contemplates the filing of just one petition. *People v. Jackson*, 2021 IL 124818, ¶ 27. However, a defendant may file a successive postconviction petition if it is required by fundamental fairness, which applies in two possible circumstances. *People v. Taliani*, 2021 IL 125891, ¶ 55. The defendant must either (1) satisfy the cause-and-prejudice test for his constitutional claim, or (2) assert a claim of actual innocence. *Jackson*, 2021 IL 124818, ¶ 27. Before filing a successive postconviction petition, the defendant must obtain leave of the trial court. *Id.*

¶ 31     Here, defendant asserted a claim of actual innocence. To establish such a claim, "the supporting evidence must be newly discovered, material and not cumulative, and of such a conclusive character that it would probably change the result on retrial. *Id.* ¶ 41. Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through exercising due diligence. *Id.* ¶ 42. Evidence is material and not cumulative if it is relevant and probative of the petitioner's innocence, and it adds to the information heard at trial. *People v. Robinson*, 2020 IL 123849, ¶ 47. The most important element of a claim of actual innocence is that the evidence be of a conclusive character, which means that it would probably lead to a different result when considered in conjunction with the trial evidence. *Id.* ¶ 47. "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. We focus on probability rather than certainty when considering whether the trier of fact would reach a different result. *Id.*

¶ 32    All well-pleaded allegations in the petition and supporting documents that are not positively rebutted by the trial record should be taken as true at the pleading stage. *Id.* ¶ 45. "Credibility findings and determinations as to the reliability of the supporting evidence are to be made only at a third-stage evidentiary hearing in a successive postconviction proceeding. *Id.* ¶ 61.

¶ 33    A trial court should deny a motion for leave to file a successive postconviction petition alleging actual innocence only if it is clear from reviewing the petition and supporting documentation that the petition cannot set forth a colorable claim of actual innocence as a matter of law. *Jackson*, 2021 IL 124818, ¶ 41. Conversely, "leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Robinson*, 2020 IL 123849, ¶ 44. We review *de novo* a trial court's denial of a motion for leave to file a successive postconviction petition. *Jackson*, 2021 IL 124818, ¶ 27.

¶ 34    Defendant argues that Chandler's and Collins' affidavits were newly discovered. For Chandler's affidavit, he argues that the evidence was unavailable to him at the time of trial and due diligence could have forced Chandler to testify because he was a co-defendant and possessed the fifth amendment right against self-incrimination. See *People v. Edwards*, 2012 IL 111711, ¶ 38 (no amount of diligence could have forced the co-defendant to violate right against self-incrimination). Defendant notes that the report of proceedings shows that before trial, Chandler's attorney stated that Chandler had an appeal pending in a postconviction matter and that he had advised Chandler to assert his fifth amendment privilege not to testify in defendant's case. Defendant cites cases stating that a defendant who pleads guilty may still assert his fifth amendment privilege. He also points to his own averments that he had tried to reach out to Chandler before trial but Chandler ignored his plea to come forward, and he points to Chandler's

attestation that he wanted to reveal at defendant's trial that Perkins was involved, but he had to look out for his own interests.

¶ 35    Defendant argues that Collins' affidavit was also newly discovered because he only learned of Collins from Chandler the previous year. Defendant maintains that there was also nothing in the record indicating that Collins was a potential witness.

¶ 36    Defendant further argues that the affidavits presented evidence that was material and not cumulative, in that evidence that Perkins was the assailant with Chandler, rather than defendant, was relevant and probative of defendant's innocence. Defendant argues that Collins' affidavit also recounts admissions by Perkins tying him to the charged offenses

¶ 37    Finally, defendant argues that evidence that Perkins and Chandler kidnapped Feehan, that Perkins made third-party admissions, and that defendant was not involved in the crimes is of such conclusive character that it would probably change the result on retrial. Defendant maintains that Chandler's affidavit undermines Feehan's identification of defendant as one of his assailants. Feehan testified at trial that he saw "the same two guys" four times, with defendant as the person who punched him. Defendant argues that accepting Chandler's affidavit as true, the person who punched Feehan was Perkins. Defendant asserts that the affidavit is also consistent in several respects with defendant's otherwise uncorroborated trial testimony, in that defendant testified that he was helping his aunt move on Friday, June 2, 2006, and that he was not involved in the offenses. Defendant admitted at trial that he was the person in the McDonald's surveillance video, and he further testified that Chandler was feeling lazy, asked him to go into McDonald's, and gave him the money to buy food, which defendant did. Defendant testified that he then gave the food to Chandler. Defendant argues that simply purchasing the food did not establish that he was one of the assailants, and it makes sense that Chandler wanted defendant to get the food so that Chandler

would not be on the video. Defendant maintains that Chandler's statement in the affidavit that he dropped defendant off at his relative's house after getting something to eat corroborated defendant's testimony that he was with Chandler on Saturday but that after going to McDonald's, Chandler dropped him off at his aunt's house. Feehan testified that his assailants gave him the food while parked in a residential area and then quickly closed the trunk, after which they called out the name "Ryan" several times. Defendant argues that the fact that the assailants were saying "Ryan" suggest that he was not one of the assailants (as defendant's name is Ryan).

¶ 38 Defendant argues that the only physical evidence purportedly connecting him to the offenses was a single thumbprint on Feehan's school schedule. At trial, Feehan testified that the schedule was in his car. Defendant testified to being in a Buick with Chandler and that it was possible that he could have touched papers that were inside, and he argues that his thumbprint could have been left in a manner consistent with innocence.

¶ 39 Defendant acknowledges that at sentencing the State introduced Chandler's handwritten police statement, which stated that defendant was the other assailant and detailed their activities during the time in question. Defendant asserts that although Chandler's statement could serve to impeach Chandler, he had not yet testified. He further argues that the purpose of impeaching evidence is to attack the credibility of a witness, and credibility findings and determinations as to the reliability of supporting evidence are to be made only at a third-stage postconviction proceeding. See *Robinson*, 2020 IL 123849, ¶ 61.

¶ 40 Regarding Collins' affidavit, defendant again states that it shows that another person, namely Perkins, committed the offenses. Defendant argues that although Collins does not give an exact date on which Perkins and Chandler came to her house, there is no question that it would be June 2, 2006. Defendant argues that the assertions that they were driving a maroon Buick, that

Collins heard banging noises coming from the trunk, and that Perkins said that they were playing a joke on someone, were consistent with Feehan's testimony that his assailants stopped several places while he was in the trunk. Defendant argues that Perkins's inculpatory statements, that he was on the run because the man in the trunk was the car's owner and had gone to the police, were also consistent with Feehan's testimony. Defendant argues that the two affidavits put the trial evidence in a different light and undermine confidence in his guilt, thus meeting the conclusive character standard.

¶ 41    The State argues that the information in defendant's affidavit was not newly discovered because it contains information that he was clearly aware of before trial, and he did not allege any objective factors that prevented him from obtaining the information after Chandler was convicted and sentenced, which was before defendant's trial, or after defendant's own conviction and the date of his original postconviction petition. The State further argues that nothing in Chandler's affidavit demonstrates that he would have refused to testify at defendant's trial or would have testified consistently with his affidavit at that time and does not explain why the information could not have been discovered before defendant filed his first postconviction petition.

¶ 42    The State acknowledges that the assertion in the affidavits that someone other than defendant was the co-defendant who committed the offenses with Chandler is information that would be material and non-cumulative. The State argues that, however, the biggest flaw in defendant's argument is that the evidence at trial was overwhelming whereas the affidavits are vague and conclusory and do not explain how the information contained therein would negate the clear identification testimony at trial. The State maintains that defendant's thumb print on Feehan's schedule, which was likely used to start the fire in the car, was powerful evidence implicating defendant. The State also highlights that defendant purchased the food from McDonald's that was

given to Feehan, for which the receipt was left in the trunk with the remains of the meal. The State argues that, in contrast, Chandler's affidavit does not provide identifying information regarding Perkins or any suggestion that he resembles defendant such that Feehan's identification of defendant could have been mistaken. The State points out that Chandler's prior written statement to the police clearly states that defendant was Chandler's co-offender and the person who punched Feehan. The State maintains that Collins' affidavit has similar deficiencies regarding Perkins' identity, and she does not explain why she did not provide the information earlier.

¶ 43     The State argues that this case is readily distinguishable from *Robinson* because there the affiants had not given contrary recorded statements, and the affidavits were from uninvolved and disinterested individuals. *Robinson*, 2020 IL 123849, ¶¶ 54, 83. The State maintains that, in contrast, Chandler was a co-defendant/accomplice and interested and involved in the events, and Collins' interest or lack thereof cannot be determined from the vague representations in her affidavit, such as how she knows Chandler, Perkins, and defendant. The State also points out that in *Robinson* there was no physical, forensic, or eyewitness evidence linking the defendant to the crime (*id.* ¶ 82), whereas here there was both physical evidence and eyewitness identification.

¶ 44     As stated, to establish such a claim of actual innocence, "the supporting evidence must be newly discovered, material and not cumulative, and of such a conclusive character that it would probably change the result on retrial. *Jackson*, 2021 IL 124818, ¶ 41. It is undisputed that the statements in the affidavits that Perkins was Chandler's co-defendant, and that defendant was not involved in the crimes, would provide evidence that was material and not cumulative. However, regardless of whether the evidence can be labeled as newly discovered, it is clear that the evidence is not of such a conclusive character that it would likely change the result on retrial.

¶ 45    The central issue that the new evidence raises is that defendant was convicted based on a mistaken identity, as it was Perkins who committed the crimes for which defendant was convicted. In defendant's prior appeal, when discussing the evidence against him, we stated:

> "Feehan identified defendant as one of the assailants in a photo lineup and at trial. Feehan had four distinct opportunities to view and hear the men: when they first approached the car; when they opened the trunk and told him to stop making noise; when they gave him food; and when they put him in the outhouse. Although defendant takes issue with Feehan's descriptions of the perpetrators to the police, the difference amounts to a few inches and 10 pounds.
>
> Moreover, even if Gulley corroborated defendant's testimony that defendant hurt his hand helping someone move, it would not change the fact that defendant admitted at trial to riding around with Chandler in a maroon Buick while, according to Feehan's testimony, he was locked in the trunk of the car. Defendant also admittedly bought food from McDonald's, which is consistent with Feehan's testimony that defendant and Chandler gave him food while he was in the trunk. Correspondingly, video footage showed defendant in McDonald's, and the police found a McDonald's bag and receipt in the trunk. Defendant's admissions at trial contradict his initial statements to police, in which he denied being in the Buick or going to McDonald's, thus decreasing defendant's credibility. Given that Feehan identified defendant, whom he had never met before, as one of the assailants in an incident that took place during a time when defendant admittedly was present, defendant was not arguably prejudiced by counsel's failure to have Gulley testify that defendant hurt his hand during a move." *Harmon,* 2013 IL App (2d) 120439, ¶¶ 34-35.

¶ 46　We additionally note the following testimony of a Rockford police officer at defendant's trial. On June 6, 2006, at about 7 p.m., he met with Feehan at a relative's residence. Feehan described the lighting conditions under which he viewed the assailants. The first time, there were public streetlights that illuminated the parking lot and the surrounding area. When they opened the trunk and gave him food, it was daylight out. When the perpetrators removed him from the trunk and duct taped him, it was also broad daylight. At no time did the men mask or disguise their appearance. The officer showed Feehan six photos of black males with birth dates of 1977 through 1988, which he laid on the table individually. He told Feehan that he wanted him to look at the photos and see if he recognized anyone. The last photo the officer put down was defendant's, and Feehan immediately slapped his hand on the table and said "this is the guy who punched me." Feehan also identified defendant in court, saying "I am so sure it was you. I'm positive."

¶ 47　Chandler's and Collins' statements that Perkins was actually the man with Chandler would be very difficult to believe given that Feehan had never seen defendant before the incident but immediately picked him out of the photo line-up, along with Feehan's identification of defendant being corroborated by: an injury to defendant's hand that circumstantially resulted from him punching Feehan[3]; defendant's admitted presence in Feehan's car while Feehan was in the trunk; defendant's admitted presence in McDonald's to buy food that was given to Feehan; and defendant's fingerprint on Feehan's school schedule that had been in the car and which the evidence circumstantially indicated was used to start the fire in the car. Though not used at trial, Chandler's statement to the police is in the record and names defendant as the other perpetrator,

---

[3] The injury was on defendant's left hand, and defendant admitted in his trial testimony that he is left-handed.

and Chandler's affidavit does not explain why he named defendant if the other assailant had actually been Perkins. The affidavits also give very little information about why the affiants decided to come forward when they did and about Perkins' identity and appearance, the latter of which is especially significant given that Feehan was certain that it had been defendant.

¶ 48    In sum, we agree with the trial court that the evidence is not of such conclusive character that it would likely change the outcome on retrial, with the result that the petition does not set forth a colorable claim of actual innocence. See *Jackson*, 2021 IL 124818, ¶ 41. Therefore, the trial court did not err in denying defendant's motion for leave to file a successive postconviction petition.

¶ 49                              III. CONCLUSION

¶ 50    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 51    Affirmed.