2024 IL App (1st) 221823-U

THIRD DIVISION
May 1, 2024

No. 1-22-1823

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 08 CR 0424901 |
| | ) | |
| JAMES SMITH, | ) | |
| | ) | Honorable Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Reyes and Justice Van Tine concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court did not err in dismissing defendant's successive postconviction petition at the second stage because he failed to make a substantial showing of actual innocence. Defendant's postconviction counsel provided him with reasonable assistance. Affirmed.

¶ 2    Following a bench trial, defendant James Smith was found guilty of two counts of attempted murder and was sentenced to consecutive terms of 26 years' and 35 years' imprisonment. Following dismissal of his direct appeal and denial of his initial postconviction petition, defendant filed a *pro se* successive postconviction petition. The trial court advanced the successive petition to the second stage and appointed counsel to represent defendant. The trial

court subsequently granted the State's motion to dismiss. On appeal from that dismissal, defendant contends that he made a substantial showing of actual innocence or in the alternative, he was denied the reasonable assistance of postconviction counsel. We affirm.

¶ 3                                    BACKGROUND

¶ 4     Defendant was charged with four counts of attempted first degree murder, two counts of aggravated battery with a firearm, four counts of aggravated discharge of a firearm, and five counts of aggravated battery, in connection with the shooting of Mary and Bryant[1] Solomon on December 26, 2007. The following evidence was adduced at trial.

¶ 5                                    Mary Solomon

¶ 6     Mary Solomon testified that she lived in an apartment at 3234 West Madison Street in Chicago and had five children ranging in age from two to fourteen. On Christmas Day in 2007, she had invited family and friends over for dinner. At around 1 a.m. on December 26, people started leaving, but her younger brother (Bryant) remained at her apartment along with Pamela Herron and Shandrika Dixon. In addition, Mary's other friends, Crystal Moore and Winter Parker, arrived at around 1:30 a.m. and 2 a.m., respectively. Moore, who was the mother of defendant's child, lived in the apartment building across from Mary's.

¶ 7     Soon after Moore arrived, Mary saw Moore and Bryant go into the bathroom together, but Mary "put them out" of the bathroom because they were "trying to do sexual things." Bryant and Moore then went into the hallway outside of Mary's apartment, after which Mary could hear them "trying to have sex."

---

[1] Although Bryant testified at trial that he also goes by the name of "Brian Solomon," the signature at the bottom of the complaint in this case was signed "Bryant Solomon." We therefore will refer to this victim as "Bryant."

¶ 8     Around ten minutes after Bryant and Moore went into the hallway, Mary heard "hollering and screaming," and when she went to the hallway, she saw defendant (whom she identified in court) and Bryant fighting. Mary pulled them apart, and then defendant left the building while Bryant went back into Mary's apartment.

¶ 9     According to Mary, a little after 2 a.m., she walked with her brother out to a car driven by her "God brother," Leonard Bunch, whom she also knew as "Bird." When Bryant got into the car, defendant "came from nowhere" and slapped her on the left side of her face with his hand. Herron, who was standing next to Mary, began running away, and defendant started chasing her.

¶ 10     Bryant then got out of the car, and he and defendant began fighting again. Eventually, defendant got into a car, and "just start[ed] trying to run everybody over." Mary said that defendant hit Bryant with the car—specifically, the front bumper of the car struck the bottom of Bryant's leg. Defendant then drove off with two other people in the car. Mary, Bryant, Herron, and Parker then went back to Mary's apartment.

¶ 11     Back at the apartment, the group sat down in the front room and discussed what had just happened. Mary sat on a stool near the three front windows, Bryant sat on the couch facing the windows, Herron and Parker were seated at the table in the front room, and Dixon sat near the front door. Mary said that there were shades covering the windows, but two of them were down, while one of them was "kind of up." Mary nonetheless was able to see outside because one of the shades was torn in the middle. In addition, Mary stated that she had positioned her head in between the shades so she could see out of the window. There was nothing blocking her view.

¶ 12     After about ten minutes, she saw defendant get out of a car and cross the street, heading toward her building. Defendant, who was wearing a black or gray "hood," ran to her apartment until he was about one or two inches from her window. Mary could see his face, which was "very

3

close" to her. At that point, defendant asked Mary, "where that [*sic*] n***** at now?" Mary responded, "[H]e's not here," referring to Bryant. Defendant repeated his question, and Mary again said Bryant was not there. Mary explained that Bryant was still sitting on the couch and she was "trying to hide [him]" from defendant.

¶ 13    Mary said that defendant "had this look on his face," and she could see him "pulling something" near his waist. Mary tried to turn toward Bryant and tell everyone to run. She then heard defendant say, "[T]here that n***** go right there," and then "pow pow."

¶ 14    Mary described feeling a burning sensation all through her body and her chest, starting from her left arm. Her legs "gave out," and she fell to the floor. Mary explained that the bullet hit her and turned her halfway around in the stool, and she fell down the wall "on [her] back."

¶ 15    After she fell, she heard another five or six gunshots before they stopped. She then heard people saying, "I'm shot. I'm shot." Although she testified that paramedics came and took her to the hospital, she did not remember that because she was "out." She remained in the hospital for nearly three months, but she could no longer walk when she was discharged.

¶ 16    Mary stated that she no longer has any movement in the lower half of her body, and she can only "feel from my chest up." In response to the State's question, she said that she had known defendant for about two years prior to the shooting.

¶ 17    On cross-examination, Mary said that Herron and Parker arrived at around 11 p.m. and 2 a.m., respectively. She further acknowledged that she had served daiquiris at the party, but that she had had only one. In addition, she recalled that defendant had braids in his hair at the time of the shooting (the trial court then observed for the record that defendant had an Afro and no braids at trial). Mary confirmed that defendant was wearing a white t-shirt, blue jeans, and a jacket, and she did not see a gun or the silhouette of a gun during either the fight in the hallway or the fight

shortly thereafter on the sidewalk. She stated that, at the time of the shooting, defendant did not have his hood up over his head or face, and she denied telling detectives that the person who shot her was wearing a hood that covered his head. On redirect examination, Mary stated that, although she had a daiquiri, it did not hinder her ability to see.

¶ 18                                Pamela Herron

¶ 19    Pamela Herron then testified that she went to Mary's house on December 25, 2007, for a Christmas party, arriving at around 8 p.m. Herron said that her friend, Katina Dunn, came with her. Herron said that Bryant was already there, and after Moore arrived, they went into Mary's bathroom. Mary then "holler[ed]" at them to get out of the bathroom, so they went back to the couch initially before Moore left the apartment. Bryant eventually left the apartment as well. Herron then heard the "buzzer" to Mary's apartment sound and voices from the speaker stating, "I about to beat your b**** a** or something."

¶ 20    Herron then ran to the back of the apartment to tell Mary about the fight. She and Mary went into the hallway and saw defendant (whom Herron identified in court) fighting with Bryant. Mary broke up the fight, and then Herron saw defendant leave the building. Mary, Herron, and Bryant then went back into Mary's apartment. Herron did not see where Moore went.

¶ 21    According to Herron, Mary wanted Bryant to leave because Mary did not want any more "chaos" in her house. Herron said that she and Mary walked Bryant out to "Bird," who was in his car. Bryant got into the car, and then defendant drove up "real fast" to them, got out of the car, and hit Mary with his hand. Herron then saw Bryant get out of the car and start fighting with defendant again. When the fight ended, defendant got into his car and started "reversing back and forth like [he was] trying to hit everybody with his car." Herron said that he tried to hit her first,

and then he hit Bryant by his knees. Defendant then drove off to the west. Herron, Mary, Bryant, and Parker then returned to Mary's apartment.

¶ 22    When the group returned to Mary's apartment, they sat in the living room. Herron said that she sat at the table, Mary sat at the window, Bryant was on the couch (directly across from the window), Parker was across from Herron, and "Katina" (Herron's friend) was on another couch. Mary was looking out of her window through a split in the window shade, with the larger portion of the split shade resting over Mary's right shoulder. The group was talking about the events that had just transpired. Mary and Herron believed that defendant would return, but Bryant disagreed. Herron then heard a loud "bang" on the window. Herron looked at the window and saw defendant—not through the slit, but rather "through the side."

¶ 23    Herron then heard defendant say, "[W]here the f*** that b**** a** n***** Brian [*sic*] at?" Herron heard Mary say Bryant was not there. According to Herron, defendant again asked, "[W]here that n***** at?," and Mary again told him that Bryant was not there. Herron heard defendant say, "[T]here he go right there." She then saw "fire" coming from the window area. She fell down under the table and heard the sound of multiple gunshots. Herron identified defendant in court as the person who was at the window when she saw fire coming from the window and heard the gunshots.

¶ 24    Herron said she heard more than five shots and possibly as many as eight. Herron heard everyone saying that they were shot and noted that she was "grazed" between her legs. She looked over at Mary and saw that Mary was lying on the floor under the window.

¶ 25    On cross-examination, Herron stated that she had seen defendant "a lot of times" but had never spoken to him. Herron further stated that defendant's hair at the time of the shooting was different in that he had small braids that stopped above the back of his neck. Herron described

being about four feet from the window, and she said that she saw the front of defendant's face. Herron further explained that, although the slit in Mary's window shade was only approximately one inch wide, the "right part" of the split shade was pulled away from the window where the portion of it was over Mary's back. Herron said that she saw his face until the shots were fired and estimated that it was about "a few minutes."

¶ 26                                  Bryant Solomon

¶ 27     The State next called Bryant Solomon to testify. At the outset, Bryant admitted that he was currently incarcerated and that he had been convicted of multiple drug-related offenses on December 22, 2008, June 29, 2006, November 3, 2004, and April 22, 1999. In addition, he conceded that he was convicted of aggravated battery of a police officer on April 21, 2000 and unlawful use of a weapon by a felon on April 22, 1999. Bryant then testified as to the events of the evening, which was substantially the same as Mary's and Herron's testimony. Bryant added that he saw defendant (whom he identified in court) start shooting and heard five or six gunshots. Bryant stated that he was shot in his right foot and found the bullet lodged in his shoe.

¶ 28                                  Shandrika Dixon

¶ 29     Shandrika Dixon testified that Mary was her cousin and that, on December 25, 2007, she was at Mary's apartment for dinner. Dixon's testimony as to the events leading up to the shooting was substantially the same as Mary's. Dixon stated that, after the fight in the hallway between defendant and Bryant, Dixon returned to the apartment and did not accompany Mary when she and others went outside to walk Bryant to "Bird's" car. Dixon remained inside the apartment and did not see the second fight that took place.

¶ 30     Dixon said that, when the group returned to the apartment, she noticed that Mary looked upset and was holding the right side of her face. Shortly after returning to the apartment and while

Dixon was sitting by the front door, she saw Mary "open[] up the shade at the slit" and look out of the window. Dixon confirmed that she could see out of that window from her vantage point. Dixon said she saw defendant (whom she identified in court) at the window, about three to four inches from it. Dixon heard defendant ask Mary, "[W]here that n***** Brian [*sic*] at," and Mary say that Bryant was not there. Dixon then heard defendant again ask Mary, "[W]here that n***** at, where he at," and Mary repeat that Bryant was not there. Next, Dixon heard defendant say, "[T]here that n***** go right there." Immediately afterwards, Dixon saw a flash of light from the window, which she said was "the reflection off the bullet *** when you shoot," and then the sound of glass shattering. Dixon collided with Bryant and then ran to the back. Dixon heard about six gunshots and then "peeked around the corner" from the kitchen to see if defendant was still there. She saw Mary lying on the floor.

¶ 31                                  Germaine Plase

¶ 32     Germaine Plase testified that, in the early morning hours of December 26, 2007, he was drinking with some friends in the parking lot near Mary's apartment building. Plase saw only the fight between defendant (whom he identified in court) and Bryant "[o]n the curb" next to Madison Street. After the fight, Plase saw defendant drive westbound on Madison. Later, Plase saw someone who "looked like" defendant walking eastbound on Madison toward Mary's apartment. Plase said the individual was about 50 feet from him and it looked like that person had a gun. The individual looked at Plase and his friends, and they then "retreated to the back of the parking lot." Plase then heard five or six gunshots from the direction of Mary's apartment. Plase saw the shooter get into a silver car and drive off. Plase ran to Mary's apartment and saw her bleeding on the floor by the window. Plase later provided a written statement to an assistant state's attorney. Plase said he did not remember telling the assistant state's attorney that he saw defendant get out of the car

and walk toward him and his friends and that defendant was only about 20 feet from him at that time. On cross-examination, Plase admitted that he had been drinking "Gray [*sic*] Goose" for about 20 minutes before the fight he witnessed between defendant and Bryant, but Plase stated that he was sober. Plase further stated that, when defendant walked to Mary's apartment holding a gun, defendant was wearing a "hoodie" with the hood pulled over his head, covering defendant's hair and the side of his face.

¶ 33                                  Additional Trial Proceedings

¶ 34    The parties then stipulated, *inter alia*, that (1) Bryant identified defendant as the shooter in a photo array while Bryant was at the hospital following the shooting and (2) various bullet fragments recovered from Mary's body, Bryant's foot, Bryant's shoe, and throughout the apartment were fired from the same .357- or .38-caliber weapon.

¶ 35    After the parties rested and presented their closing arguments, the trial court found defendant guilty of the attempted first-degree murder of Bryant and Mary. The trial court subsequently sentenced defendant to an aggregate term of 61 years' imprisonment on his convictions. Defendant appealed his conviction and sentences, but this court later granted defendant's motion to dismiss his appeal. *People v. Smith*, No. 1-09-2261 (Oct. 19, 2010).

¶ 36                           Defendant's Initial Postconviction Petition

¶ 37    On April 11, 2011, defendant filed his initial postconviction petition, arguing that (1) his jury trial waiver was unknowing and unintelligent because of ineffective assistance of trial counsel; (2) he received ineffective assistance of trial counsel for failure to call James Davis to testify that another individual and not defendant was the shooter; and (3) the trial court should allow him to obtain the unredacted police reports to determine whether trial counsel was ineffective for failure to prove-up "crucial impeachment evidence" of Mary and Herron.

¶ 38 As to the second claim, defendant attached the affidavit of James Davis, who stated that defendant was neither the shooter nor at the scene at the time of the shooting, and the affidavits of Moore, Carolyn Turner (defendant's mother), and Ronald Renfro (defendant's stepfather), all of whom stated that they told trial counsel that James Davis was available to testify. The trial court held a third-stage evidentiary hearing on the first claim, at which postconviction counsel stated that they were withdrawing the second and third claims. The trial court denied defendant's petition after the hearing, and we affirmed. *People v. Smith*, 2014 IL App (1st) 130172-U.

¶ 39                     Defendant's Second Postconviction Petition

¶ 40 On August 6, 2015, defendant filed the instant successive postconviction petition. Defendant alleged, *inter alia*, that he was alleging actual innocence, thus excusing him from both (1) showing cause and prejudice (for failing to raise the claims in his initial petition) and (2) seeking leave from the trial court to file his successive petition. Defendant argued that he was denied his right to a "reasonable pretrial investigation" and his right to present a defense based upon trial counsel's failure to present the testimony of alibi and occurrence witnesses.

¶ 41 Defendant again attached the affidavits of Moore, his mother, and his stepfather that he had attached to his initial postconviction petition. In addition, defendant attached affidavits from Tanya Robinson and Tracey Davis. Robinson stated in her affidavit that defendant was at her grandmother's Christmas party at the time of the shooting and that she, her grandmother, and defendant had all asked defendant's trial counsel to call them as witnesses, but counsel refused.

¶ 42 Tracey Davis stated in her affidavit that she personally knew defendant because he had a child with her cousin. She then stated that, at around 3:15 a.m. on December 26, 2007, she had been looking out of her grandmother's apartment when she saw a car pull up in front of the building (also at 3234 West Madison Street) and four individuals get out of the car. One of the individuals

she knew as "Itevis" was about 50 feet from her and carrying a gun. Tracey stated that she heard six gunshots and then saw the four individuals get back into their car and drive off. She added that defendant, who she said was the father of her cousin's child, was not the shooter or one of the others in the car. Tracey explained that she did not come forward because she had feared for her safety until recently when she found out that Itevis was dead.

¶ 43    On October 29, 2015, the trial court advanced the petition to the second stage, appointed counsel to represent defendant, and continued the matter to December 3, 2015. At that time, an assistant public defender stated that she had been assigned to the case and had spoken to the assistant state's attorney, and that she was seeking the case transcripts and requesting entry of an agreed order continuing the matter to March 3, 2016. On March 3, 2016, the assistant public defender informed the court that defendant had a "voluminous" postconviction petition and had just submitted additional affidavits for her review. She added that she was still waiting for the transcripts. The cause was thereafter continued multiple times.

¶ 44    On June 29, 2017, the assistant public defender informed the trial court that she had not had an opportunity to review the "seven volumes of transcripts" in the case. The matter was then eventually continued to April 12, 2018. On that date, counsel informed the court that she had noticed "some filing, perhaps a *pro se* filing," but she had not received anything. The trial court had her review the court file, and after finding an "addendum" that defendant had filed *pro se*, the court arranged to have a copy made for her.

¶ 45    The cause was again continued multiple times to October 25, 2018. At that time, the cause was assigned to Assistant Public Defender Price-Horton, who requested a continuance to review the file and pleadings. The cause was again continued.

¶ 46    On March 9, 2020, Assistant Public Defender Price-Horton filed a certificate pursuant to supreme court rule 651(c) (Ill. S. Ct. R. 651(c) (eff. July 1, 2017)). Price-Horton's certificate stated that she had reviewed the appellate records (including the two prior appellate court orders), the transcripts of defendant's trial and sentencing hearing, as well as the "court file." Price-Horton noted, however, that she was unable to review private trial counsel's file because he was no longer practicing law. Finally, she stated that she had not filed an amended petition because defendant's *pro se* postconviction petition "adequately set forth" defendant's claims.

¶ 47    The State subsequently moved to dismiss defendant's successive postconviction petition. On November 29, 2022, the trial court held a hearing on the State's motion. During the hearing, the State argued, *inter alia*, that Tracey Davis' affidavit lacked specificity where it failed to explain "who this person is, how she came to learn of their [*sic*] existence." The State added that the claim in the affidavit was rebutted by the record because "four or five different people" had identified defendant as the shooter.

¶ 48    In response, defendant's postconviction counsel stated that, "in reviewing the previous trial information, as well as anything new, which does not exist, I have not been able to find anything that would be new evidence that would support this second successive petition." The trial court then asked her for her "position" on the Tracey Davis affidavit. Counsel responded, "I think the information contained therein is very brief, and *** it's very brief in its explanation." She added that she did not think that it was "very clearly stated" and that it would raise "plenty of questions." She further opined, "I don't think there's any clear newness with regard to that." At the conclusion of the hearing, the trial court granted the State's motion.

¶ 49    This appeal follows.

¶ 50                                    ANALYSIS

¶ 51    Defendant first contends that the trial court erroneously granted the State's motion to dismiss his successive postconviction petition at the second stage.  Specifically, defendant argues that the successive petition and the Tracey Davis affidavit, which stated that an individual she knew as "Itevis" committed the shooting, provided a substantial showing of his actual-innocence claim, thus warranting a third-stage evidentiary hearing.  In the alternative, defendant contends that postconviction counsel rendered unreasonable assistance when she failed to conduct "further investigation *** to learn the full name of the shooter" and provide a more detailed affidavit. Defendant argues that, on this claim, this court should reverse the dismissal of his successive petition and remand the cause for appointment of new counsel and further second-stage proceedings.  We first consider the dismissal of his successive postconviction petition.

¶ 52              The Dismissal of Defendant's Successive Postconviction Petition

¶ 53    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014) (Act) allows a defendant to challenge a conviction or sentence for violations of federal or state constitutional rights.  *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006).  An action for postconviction relief is a collateral proceeding rather than an appeal from the underlying judgment. *People v. Williams*, 186 Ill. 2d 55, 62 (1999).  *Res judicata* and waiver will limit the range of issues available to " 'constitutional matters which have not been, and could not have been, previously adjudicated.' " *People v. Scott*, 194 Ill. 2d 268, 273-74 (2000) (quoting *People v. Winsett*, 153 Ill. 2d 335, 346 (1992)).  Accordingly, rulings on issues that were previously raised at trial or on direct appeal are *res judicata*, and issues that could have been raised in the earlier proceedings, but were not, will ordinarily be deemed waived.  *Id.* at 274; 725 ILCS 5/122-3 (West 2014).

¶ 54　Postconviction proceedings contain three stages. *People v. Tate*, 2012 IL 112214, ¶ 9. At the first stage, the trial court independently reviews the petition, taking the allegations as true, and determines whether the petition is frivolous or patently without merit. *Id.* If the petition has no arguable basis either in law or in fact, the court may summarily dismiss it as frivolous or patently without merit. *Id.* If it is not summarily dismissed, the petition advances to the second stage, where counsel may be appointed to an indigent defendant, and where the State may respond to the petition. *Id.* ¶ 10. At this stage, the court determines whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *Id.* If no such showing is made, the petition is dismissed. Otherwise, the petition is advanced to the third stage for an evidentiary hearing. *Id.*

¶ 55　In this case, the petition was dismissed at the second stage of proceedings. During the second stage of proceedings, a defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 35. This stage, however, only tests the legal sufficiency of the petition. Unless the allegations in the petition are positively rebutted by the record, they are taken as true, and the question to be resolved at the second stage is whether those allegations establish a constitutional violation. *Id.* "In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing," would entitle the defendant to relief. (Emphasis in the original.) *Id.*

¶ 56　The Act contemplates the filing of only a single petition. *People v. Jackson*, 2021 IL 124818, ¶ 27 (citing *People v. Robinson*, 2020 IL 123849, ¶ 42; 725 ILCS 5/122-3 (West 2014) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended

petition is waived.")). However, the bar against a successive filing will be relaxed when a defendant raises either (1) a constitutional claim by satisfying the cause-and-prejudice test (725 ILCS 5/122-1(f) (West 2014)), or (2) a claim of actual innocence. *Id.* (citing *Robinson*, 2020 IL 123849, ¶ 42 (citing *People v. Edwards*, 2012 IL 111711, ¶ 23)).

¶ 57    Defendant here has raised a claim of actual innocence. To establish this type of claim, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Id.* ¶ 41. Within the context of an actual innocence claim, "newly discovered" evidence is evidence that was "discovered after trial and that the defendant could not have discovered earlier through the exercise of due diligence." *Id.* ¶ 42. The conclusive nature of the evidence is the most important factor. *Edwards*, 2012 IL 111711, ¶ 40 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). In essence, to meet the conclusiveness element, the proffered new evidence must "raise the probability that, in the light of the new evidence, it is more likely than not that no reasonable juror would have convicted petitioner." *Id.* We review the trial court's dismissal of a postconviction petition at the second stage *de novo*. *People v. Bass*, 2018 IL App (1st) 152650, ¶ 13 (citing *Pendleton*, 223 Ill. 2d at 473).

¶ 58    In this case, the trial court did not err in granting the State's motion to dismiss. Taking the allegations in the Tracey Davis affidavit as true, as we must (*Domagala*, 2013 IL 113688, ¶ 35), this purported evidence is not "of such conclusive character that it would probably change the result on retrial" (*Jackson*, 2021 IL 124818, ¶ 41). Tracey stated that, at the time of the shooting, she saw someone she knew as Itevis commit the offense. At best, this merely contradicts the eyewitness testimony of Mary, Bryant, Herron, and Dixon, some of whom were mere inches from defendant when he shot into the apartment from outside the front window. On these facts, since

the Tracey Davis affidavit does not raise the probability that, in the light of the new evidence, it is more likely than not that *no* reasonable juror would have convicted petitioner, defendant cannot meet the conclusiveness element. See *Edwards*, 2012 IL 111711, ¶ 40. We further note that the evidence in the Tracey Davis affidavit cannot reasonably be characterized as newly discovered: Tracey stated in her affidavit that she knew defendant because he had a child with her cousin. Her purported testimony should therefore have been discovered earlier through the exercise of due diligence. On this additional basis, defendant's actual innocence claim fails, and we must reject defendant's contention of error on this point.

¶ 59          The Unreasonable Assistance of Postconviction Counsel Claim

¶ 60    Defendant further claims that his postconviction counsel provided unreasonable assistance because she did not investigate to learn the full name of the purported shooter, "Itevis," whom Tracey named in her affidavit. Defendant argues that this additional information would have resulted in a more detailed affidavit to support his actual innocence claim. This alleged failure, according to defendant, denied him the right to the reasonable assistance of counsel. He thus asks that, should we reject his request for a third-stage evidentiary hearing on his actual innocence claim, we should reverse the trial court's granting of the State's motion to dismiss and remand this matter "for the appointment of new counsel and further second-stage proceedings."

¶ 61    The right to the assistance of counsel at trial is derived from the sixth amendment of the United States Constitution (U.S. Const., amend. VI), applicable to the states through the fourteenth amendment (U.S. Const., amend. XIV). *People v. Ballard*, 206 Ill. 2d 151, 171 (2002). By contrast, the assistance of counsel in postconviction proceedings "is a matter of legislative grace and favor which may be altered by the legislature at will." (Internal quotation marks omitted.) *People v. Owens*, 139 Ill. 2d 351, 364 (1990). Since the right to counsel in postconviction

proceedings is derived from a statute rather than the Constitution, postconviction petitioners are guaranteed only the level of assistance that the statute provides. *Id.* Section 122-4 of the Act (725 ILCS 5/122-4 (West 2014)) and Supreme Court Rule 651 (Ill. S. Ct. R. 651 (eff. July 1, 2017)) provide postconviction petitioners with only "a *reasonable* level of assistance" in postconviction proceedings and not the same level of assistance that the Constitution guarantees to defendants at trial. (Emphasis in the original.) *Owens*, 139 Ill. 2d at 364.

¶ 62    To ensure this level of assistance, Rule 651(c) imposes three duties on appointed postconviction counsel. *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). Pursuant to the rule, either the record or a certificate filed by the attorney must show that counsel (1) consulted with the petitioner to ascertain his contentions of constitutional deprivations; (2) examined the record of the trial proceedings; and (3) made any amendments to the filed *pro se* petitions necessary to adequately present the petitioner's contentions. Ill. S. Ct. R. 651(c) (eff. July 1, 2007); *Perkins*, 229 Ill. 2d at 42. The purpose of the rule is to ensure that postconviction counsel shapes the defendant's claims into a proper legal form and presents them to the court. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 18 (citing *Perkins*, 229 Ill. 2d at 44). Substantial compliance with Rule 651(c) is sufficient. *Id.* Whether counsel fulfilled her duties under Rule 651(c) is also subject to *de novo* review. *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007).

¶ 63    Here, postconviction counsel substantially complied with her obligations pursuant to rule 651(c). At the outset, she filed a Rule 651(c) certificate, which raises a rebuttable presumption that she complied with the rule's requirements and provided reasonable assistance. *Profit*, 2012 IL App (1st) 101307, ¶ 19. More importantly, counsel's certificate stated that she reviewed the trial and sentencing transcripts, the court filings, and appellate records, but she was unable to review trial counsel's file only because he was no longer practicing law. Counsel further stated

that she did speak with defendant about his claims. Notably, counsel stated at the hearing on the state's motion to dismiss that she was unable to find "anything that would be new evidence" that could arguably support defendant's successive petition. Despite this thorough review, counsel was unable to provide either (1) an additional affidavit to support the claims in the Davis affidavit or (2) a revised affidavit from Davis that would provide sufficient detail to warrant a third-stage hearing. Ordinarily, when a trial court rules on a motion to dismiss a postconviction petition that is not supported by acceptable affidavits or other documents, it may "reasonably presume postconviction counsel made a concerted effort to obtain affidavits in support of the claims but was unable to do so." *People v. Carnalla-Ruiz*, 2023 IL App (1st) 201183, ¶ 34 (citing *People v. Johnson*, 154 Ill. 2d 227, 241 (1993)). The record in this case amply supports this conclusion. Defendant's claim on this point is thus meritless.

¶ 64                                    CONCLUSION

¶ 65     The trial court did not err in dismissing defendant's successive postconviction petition at the second stage because he failed to make a substantial showing of actual innocence. In addition, defendant's postconviction counsel provided him with reasonable assistance. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 66     Affirmed.